Dorothea M. CORNWELL, Plaintiff–Appellee–Cross–Appellant,

v.

William F. ROBINSON, New York State Division for Youth, Louis E. Salem, New York State Department of Audit & Control, Patricia Hite, New York State Department of Civil Service, Frederick Hodges, Thomas Baleno, Albert El-

---

dridge, Individually, and in his capacity as Assistant Director of the MacCormick Youth Center, and Steve Centeno, Individually, and in his capacity as Senior Counselor at the MacCormick Youth Center, Defendants,

Warren Albrecht, Individually, and in his capacity as Director of the MacCormick Youth Center, Susan Yeres, Individually, and in her capacity as Assistant Director of the MacCormick Youth Center, Joseph Maffia, Individually, and in his capacity as Unit Manager and/or Senior Youth Division Counselor at the Mac-Cormick Youth Center, Frederick Felton, Frederick Brewington, Al Fields, New York State Division for Youth, Defendants–Appellants–Cross–Appellees.

Nos. 1014, 1197, Dockets 93–7618, 93–7646.

United States Court of Appeals, Second Circuit.

Argued Feb. 2, 1994.

Decided May 3, 1994.

Deborah H. Karalunas, Syracuse, NY (Kevin G. Martin, Bond, Schoeneck & King, on the brief), for plaintiff-appellee-cross-appellant.

Victor Paladino, Asst. Atty. Gen., Albany, NY (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen., of counsel), for defendants-appellants-cross-appellees.

Vincent J. Blackwood, Asst. Gen. Counsel, E.E.O.C., Washington, DC (James R. Neely, Jr., Deputy Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Samuel A. Marcosson, Atty., E.E.O.C., Washington, DC, of counsel), submitted a brief for amicus curiae E.E.O.C.

Before OAKES, KEARSE, and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Warren Albrecht, Susan Yeres, Joseph Maffia, Frederick Felton, Frederick Brewington, and Al Fields (collectively the "individual appellants"), and New

York State Division for Youth ("DFY") appeal from so much of a judgment entered in the United States District Court for the Northern District of New York, following a combined jury and bench trial before David N. Hurd, Magistrate Judge, as awarded plaintiff Dorothea M. Cornwell a total of $247,750 in compensatory and punitive damages for violations of 42 U.S.C. §§ 1983 and 1985 (1988), and compensatory damages for disparate treatment and maintenance of a hostile working environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 et seq., (1988) ("Title VII"), in connection with Cornwell's employment by DFY. Appellants contend that the district court should have (1) dismissed as untimely (a) all of Cornwell's claims under §§ 1983 and 1985, and (b) her Title VII claims to the extent that they related to events in 1986, or (2) dismissed Cornwell's Title VII disparate-treatment claims as a matter of law on their merits. Cornwell has cross-appealed, urging that if we vacate the judgment in her favor on her claims of disparate treatment, we should also vacate and remand with respect to so much of the judgment as dismissed as a matter of law her claims of retaliation.

For the reasons stated below, we conclude (1) that the statute-of-limitations defenses of the individual appellants to Cornwell's claims under §§ 1983 and 1985 should have been upheld, and (2) that Cornwell's Title VII claims were timely and were supported by sufficient evidence. In light of the latter conclusion, the cross-appeal is moot. Accordingly, the judgment in favor of Cornwell on her Title VII claims against DFY, Albrecht, Yeres, and Maffia, jointly and severally, in the amount of $175,000 is affirmed. The judgment in her favor against the individual appellants for damages on her claims under §§ 1983 and 1985 is reversed.

## I. BACKGROUND

### A. *The Parties*

At times pertinent to this action, DFY operated the Austin A. MacCormick Youth Center ("MacCormick"), a residential facility for male juvenile offenders. In 1981–1986, MacCormick was a secure facility housing about 48 to 52 residents, many of whom had committed acts that, if committed by adults, would have constituted violent felonies. During that period, Albrecht was MacCormick's director; Yeres and defendant Albert Eldridge were its assistant directors.

Among the staff at MacCormick were a number of youth division aides ("YDAs"). The duties of a YDA included supervising and counseling residents, interacting with them during "living skill hours," participating in recreational activities, and writing reports. MacCormick was divided into four units; each unit housed up to 13 residents and was assigned approximately 10 YDAs.

DFY began hiring women as YDAs at MacCormick in 1981. It assigned no more than one female YDA to any unit. The first female YDAs hired were assigned to the 4 p.m. to midnight shift. According to MacCormick policy, YDAs were allowed to bid for and work on other shifts, through a bidding system based on seniority. Nonetheless, though there was no written policy to this effect, women YDAs were not allowed to work the "overnight shift," which ran from midnight to 8 a.m. MacCormick officials maintained that, because only one YDA was on duty on the overnight shift, exclusion of female YDAs was necessary to protect privacy rights of the residents, who were to be visually supervised during their use of showers and the toilets.

Cornwell is a black woman who was first employed at MacCormick as a YDA in November 1981. She was hired as a temporary employee; in March 1982, she became a "permanent" employee, subject to a one-year period of probation. As described below, she remained employed there until February 1983 and was again employed there in March–April 1986.

Maffia and defendant Steve Centeno at various times were Cornwell's immediate supervisors at MacCormick. Felton, Brewington, and Fields, along with defendants Thomas Baleno and Frederick Hodges, were employed as YDAs at the same time as Cornwell. Each participated in one or more of the events described below.

Since appellants contend, *inter alia*, that they were entitled to judgment as a matter

of law on the merits, we summarize the trial evidence of the pertinent events in the light most favorable to Cornwell, drawing all inferences and making all credibility assessments in her favor.

### B. *The 1981–1983 Events*

From the time of Cornwell's initial orientation at MacCormick in late 1981, a number of the men on the staff expressed the view that MacCormick was not a place where women should be working. From late 1981 through early 1983, Cornwell was treated with hostility and subjected to various incidents of harassment by her coworkers. For example, they undermined her authority with the residents by refusing to cooperate in her efforts to discipline them and by referring to her in derogatory terms in their conversations with residents. She was regularly called names such as "bitch," "black bitch," or "dog fucking bitch."

In the spring of 1982, when Cornwell applied for a change of shift or a change of unit, the hostility of certain of her coworkers, including Baleno, Felton, Brewington, and Hodges, became intensified. She testified that they verbally attacked her:

> There were certain staff that just did not want me on the unit. I was referred to as a bitch. Of course, that was the primary one.
>
> And then I was referred to as a dog fucking bitch, a black whore. The white guys called me a black whore. The black guys called me a black ho, a black stank bitch, a black stank ho, variations of, you know, things like that.

(Trial Transcript ("Tr.") 1238.)

In August 1982, Donald Holly, a senior YDA who had acted as a mentor to Cornwell and a buffer between female YDAs and the men who did not want female YDAs at MacCormick, was transferred from the unit in which Cornwell worked to MacCormick's Central Service unit. Shortly thereafter, Felton told Cornwell, "Well, now that the big black Don Holly is gone, now we will get the bitches out of here, we will show Steve [Centeno] and Joe [Maffia] that we don't need these bitches around here...." (*Id.* 1249–50.) On one occasion thereafter, Felton entered a room in which Cornwell and Holly were working. In plain view of Cornwell, Felton stripped to his undershorts. Holly reported the incident to Maffia. On another occasion, Holly observed Centeno "turn[ ] his back side up ... toward [Cornwell]." (*Id.* 744.)

Other incidents included one YDA's throwing a bunch of keys at Cornwell, hitting her in the chest, Felton's threatening to "kick her ass," and Brewington's shoving Cornwell when he thought she was lodging a complaint about him to a supervisor. On another occasion, when Fields, in the company of another employee, learned that Cornwell was on the other end of the telephone line, he grabbed the phone and made kissing noises into it, which he explained to the employee meant that Cornwell was to "kiss his ass." On many occasions, male YDAs in Cornwell's presence would grab their crotches. Cornwell testified, "they actually sneered and fondled themselves, and it was directed to me accompanied by 'bitch'." (*Id.* 1354.)

In October, Hodges sexually propositioned Cornwell. When she rebuffed his advance, he grabbed at her chest and ripped her blouse. Another YDA had to come to Cornwell's assistance. Though Cornwell complained to her superiors, Hodges was not disciplined. Yeres simply told Cornwell, "if this ever happens again, I want you to take it outside the [facility]" (*id.* 1258); and Centeno said, "maybe there is some truth [ ] to this ... maybe we don't need women here" (*id.* 1255).

On January 12, 1983, at the end of a special staff meeting, Brewington announced that the YDAs had "all agreed" to make lists of deficiencies in Cornwell's work, to be read at the meeting. Cornwell testified that Brewington

> pulled out [a] list and he says, now, you know, we all agreed that we were going to make lists and tell Dorothea what she has been doing wrong, you know, because we have got to take care of this shit, we have got to get these bitches off the unit here, they are weak, and they are just bad, and they are making it bad for all of us. And then he proceeded to read all of these

things about me, and when he got finished, I just sat there and I just tried everything to keep from crying.

(*Id.* 1277.) Cornwell testified that in response, she

was just trying to keep back the tears, and I had said that if I had done anything wrong, then I expected everybody to write me up. This was the first time that I had heard any of this stuff. I had not heard it. I did not have write-ups.

(*Id.* 1279.) Cornwell testified that when she tried to speak up in her own defense, her detractors persisted in talking about "bitches [being fired], [that] they did not want any women up there on that facility" (*id.* 1280), and "that they were going to get me" (*id.* 1286).

Just before the part of the meeting in which Cornwell was to be castigated by other YDAs, Maffia and Centeno had deliberately absented themselves, despite the urging of Cornwell and two other YDAs that they stay. Cornwell testified that when Maffia and Centeno eventually returned to the meeting,

Tom Baleno and Fred Hodges and Rick [Brewington] and Freddie Felton [were] standing up. I remember Tom Baleno and Fred Hodges coming toward me and saying we are not—we are not going to take her back. And I remember them threatening me. They were swearing at me and they had their fists clenched, and they walked around me, and I was crying.

(*Id.* 1280.) Holly, who had not attended the meeting but observed Brewington and Felton leaving it, testified that he saw Cornwell in tears and that he heard Brewington and Felton saying, *inter alia,* "well, we got the bitch...." (*Id.* 748.)

Following that meeting, Cornwell sent Albrecht and Yeres a memorandum outlining what had happened and asking to meet with them. She received no response.

On January 29, 1983, while Cornwell was in the facility's gymnasium working with residents, Baleno deliberately and without warning hit Cornwell in the chest with a basketball. The blow knocked her to one knee and badly bruised her chest. When Felton shortly thereafter entered the gym, Cornwell heard Baleno say to him, "I got the bitch." (*Id.* 1286.)

In the wake of this attack, at Centeno's suggestion, Cornwell took about a week off, during which time she was treated for, *inter alia,* high blood pressure and depression. Upon her return, she filed a complaint with DFY's Affirmative Action Office ("Affirmative Action Office"), alleging, *inter alia,* that her coworkers had sexually harassed her. The Affirmative Action Office made a preliminary finding of probable cause. Thereafter, DFY caused a task force to conduct a further investigation, which resulted in a finding of "no probable cause" to substantiate Cornwell's claims.

On February 26, 1983, Cornwell went on sick leave and eventually began to receive workers' compensation benefits stemming from the January 29 basketball incident. During her absence, she received psychiatric treatment for emotional problems, including depression and anxiety. In the meantime, Albrecht extended Cornwell's probationary period for 26 weeks, citing her difficulty in getting along with coworkers. He testified at trial that he did not know who was causing the difficulty. In November 1983, as described in Part I.D. below, Cornwell filed complaints with local and federal agencies complaining of employment discrimination by DFY.

On November 26, 1984, Cornwell's workers' compensation benefits were terminated. On receipt of verification by Cornwell's doctor that she was still unable to return to work, her employment was terminated on January 30, 1985, subject to reinstatement upon certification of her ability to return, pursuant to New York Civil Service Law § 71 (McKinney 1987).

C. *The 1986 Events*

In 1986, Cornwell's doctor certified that she was able to return to work, and on March 26, Cornwell was reinstated by DFY. Cornwell was again assigned to MacCormick and was again directly supervised by Maffia. Centeno, Brewington, and Felton no longer worked at MacCormick. Hodges and Fields, participants in the harassment of Cornwell in

1981–1983, were still YDAs at MacCormick in 1986.

Despite the departures of some of Cornwell's tormentors, the conditions at MacCormick remained remarkably similar to those in 1981–1983. Her coworkers continued to ostracize her, and she testified at trial that it appeared that nothing had changed. On one occasion, after Cornwell had mentioned to Fields that she was afraid of birds, Fields and other YDAs proceeded to obtain a dead bird and to chase her about the facility with it. In the course of the chase, Cornwell sustained a bloody nose. For this incident, Fields was disciplined.

On April 25, 1986, Eldridge and Maffia met with Cornwell and accused her of giving a former MacCormick resident a ride from Binghamton, New York, to New York City. When Cornwell attempted to leave the room, Eldridge and Maffia physically stopped her. Cornwell's nose began to bleed and she became hysterical. On that day, Cornwell left MacCormick and never returned. On May 27, 1987, her employment with DFY was officially terminated.

### D. *Cornwell's Administrative Filings*

On November 22, 1983, while on hiatus from MacCormick, Cornwell filed a complaint with the New York State Division of Human Rights ("DHR") and the United States Equal Employment Opportunity Commission ("EEOC"), alleging that DFY, the New York State Department of Civil Service ("NYS Civil Service"), and the New York State Department of Audit and Control ("NYS Audit") had discriminated against her on the basis of gender in relation to her employment. The complaint alleged, *inter alia*, that she had been subjected to sexual harassment, both verbal and physical, from her male coworkers and that, although she had reported the incidents to her superiors, they had failed to take remedial action, and the work environment had become increasingly hostile and threatening.

On January 30, 1986, DHR dismissed Cornwell's complaint, finding "no credible evidence to support the complainant's charge of discrimination because of sex" and stating that the "record indicate[d] that whenever complainant made timely complaints regarding co-workers' alleged sexual discrimination towards her, respondent supervisors responded by investigating alleged incidents, disciplining co-workers and apologizing for co-workers['] derogatory statements." DHR stated, however, that it "cannot condone the respondent agency's allowance of the use of sexually derogatory terms by its staff members," and it recommended "increased affirmative action efforts in this area." On April 24, 1986, EEOC adopted the determination of DHR and issued a right-to-sue letter.

On June 17, 1986, Cornwell filed a second set of charges with DHR and EEOC, complaining of the events that occurred during her one-month return to work at MacCormick earlier that year, including the incident in which Fields and other YDAs chased her with a dead bird, and the final meeting with Eldridge and Maffia. DHR did not act on these charges, and on April 24, 1987, EEOC issued another right-to-sue letter.

### E. *The Complaints in the Present Action*

Cornwell filed her first complaint in the present action in the district court on June 18, 1986 (the "original complaint"), complaining of the events from November 11, 1981, to February 26, 1983, and alleging that she was a victim of gender and race discrimination, in violation of Title VII and 42 U.S.C. §§ 1981, 1983, 1985, and 1986 (1988). The original complaint named as defendants DFY, William F. Robinson, NYS Audit and its Personnel Director Luis Salem, and NYS Civil Service and its attorney Patricia Hite. Although an exhibit to the complaint detailed many of the 1981–1983 incidents described above, identifying Brewington, Baleno, Felton, and Hodges as the principal perpetrators and Albrecht, Yeres, Maffia, and Centeno as the supervisory personnel who had failed to take any action to remedy the situation, the original complaint did not name any of these individuals as defendants. The original complaint also did not describe any of the events that had occurred in 1986.

A lengthy period of relative inaction ensued, with Cornwell experiencing a number of misfortunes with her attorneys. The at-

torney who filed the original complaint was replaced by an attorney who subsequently was suspended from the practice of law; the suspended attorney was replaced by the original attorney, who unexpectedly passed away; after his death, his firm withdrew from the case. Eventually, in 1990, Cornwell's present counsel were substituted.

On May 20, 1992, Cornwell filed an amended complaint (the "amended complaint") adding, *inter alia*, allegations relating to her 1986 employment at MacCormick and a claim that she had been the victim of retaliation for her 1983 filings of administrative complaints of discrimination. The amended complaint continued to name as defendants DFY, NYS Audit, and NYS Civil Service; it dropped Robinson, Salem, and Hite as defendants; and it added as new defendants Albrecht, Yeres, Eldridge, Maffia, Centeno, Hodges, Felton, Brewington, Baleno, and Fields.

All of the named defendants except Hodges and Baleno answered the complaint, raising, *inter alia*, statute-of-limitations defenses. All of those who answered, except Felton and Brewington, moved for partial summary judgment. To the extent pertinent to the present appeal, these motions contended that Cornwell's claims under 42 U.S.C. §§ 1983 and 1985 arose during her first tour of duty at MacCormick, which ended on February 23, 1983, and were therefore barred by the three-year statute of limitations; and they contended that Cornwell's Title VII claims relating to the events that occurred in 1986 were untimely because the amended complaint was not filed within 90 days after the issuance of the second EEOC right-to-sue letter. In an order dated September 25, 1992, the district court, though dismissing certain of Cornwell's claims, including the claims against NYS Audit and NYS Civil Service, rejected the motions to dismiss on statute-of-limitations grounds without comment. Prior to trial, the district court also dismissed all claims against Hodges and Baleno on the ground that those defendants had not been served with process.

Cornwell's undismissed claims under Title VII, § 1983, and § 1985 were tried before the magistrate judge and a jury, with the jury asked to render an advisory verdict with respect to the Title VII claims.

### F. *The Jury Verdicts and the Findings of the District Court*

At the close of Cornwell's case, the trial court dismissed her retaliation claim, finding that there was insufficient proof that any of the acts of which she complained had occurred in response to her filing charges with DFY's Affirmative Action Office, DHR, or EEOC. The court also dismissed the Title VII claims against Felton, Brewington, and Fields on the ground that they were not Cornwell's supervisors.

The court denied defendants' renewed motion for dismissal of the remaining claims on statute-of-limitations grounds. It found that the amended complaint related back to the June 18, 1986 filing of the original complaint, and thus was deemed filed on that date. It also found that the events that occurred in 1986 were part of a continuing violation that began with those that occurred in 1981–1983:

> In this case, the evidence seems to be that the only reason that the acts of sexual and racial harassment and discrimination did not continue specifically between 1983 and 1986 was because the Plaintiff was no longer employed or working at the facility, and that when she returned within a month, she was left again with the same supervisors involved, many of the same fellow workers involved.

(Tr. 1391.)

The jury was given a special verdict form and asked to render a verdict with respect to the § 1983 and § 1985 claims and an advisory verdict with respect to the Title VII claims. With respect to the § 1983 and § 1985 claims, the jury found that Cornwell had established by a preponderance of the evidence that she had been the victim of intentional discrimination on the basis of her gender, though not on the basis of her race, in the terms and conditions of her employment at MacCormick; that she had been the victim of harassment based on both gender and race in connection with that employment; and that the gender discrimination and the harassment proximately caused her damages. Focusing on individual responsibility, the

jury found that Albrecht, Yeres, Maffia, Centeno, Felton, Brewington, and Fields had caused or permitted the sexual discrimination and the harassment of Cornwell, that those defendants had engaged in a conspiracy to deprive Cornwell of her civil rights, and that they had acted maliciously or wantonly in their actions against Cornwell so as to be liable for punitive damages. It found that as a remedy for her resulting disability, mental anguish, and loss of enjoyment of life, Cornwell was entitled to compensatory damages from those defendants in the amount of $55,-000. The jury found that Cornwell had not established that her rights were violated by Eldridge.

With regard to Cornwell's Title VII claims, the jury's advisory verdict was that DFY had a policy of treating women differently from men in the conditions of their employment at MacCormick and that DFY or its supervisory officials allowed a pattern of gender and/or racial harassment to persist, which created a hostile work environment and adversely affected Cornwell's working conditions. It advised that DFY's discriminatory policies and pattern of harassment proximately caused Cornwell lost earnings in the amount of $175,000.

Noting the jury's advisory verdict, the trial court made the following findings of fact pursuant to Fed.R.Civ.P. 52(a). The court found that it was the policy of DFY and its supervisors Albrecht, Yeres, Maffia, and Centeno to treat women differently than men by having only one woman in each unit and by excluding women from the 8 a.m. to 4 p.m. shift and the midnight to 8 a.m. shift; that these defendants treated Cornwell differently from the male YDAs; and that their reasons for doing so were pretextual and not legitimate. The court found that, "because of her race and gender," these defendants had permitted Cornwell to suffer

> continuing profane language and obscene gestures from fellow workers directed at her ...; isolation ...; unfair treatment in shift and unit assignments ...; attitudes of men being unwilling to work with women; target of meetings ...; and other adverse acts directed against her.... As a result, [Cornwell] lost earnings in the

sum of one seventy-five thousand dollars [*sic*] which includes prejudgment interest to date.

Findings of Fact and Conclusions of Law dated March 22, 1993, at 4–5. After a further trial on issues relating to punitive damages in connection with the claims under §§ 1983 and 1985, the jury awarded Cornwell such damages against the individual defendants in the aggregate amount of $17,750.

In accordance with the verdicts and its own findings, the court entered judgment in favor of Cornwell for $175,000 in compensatory damages against DFY, Albrecht, Yeres, Maffia, and Centeno, jointly and severally, on the Title VII claims; and for $55,000 in compensatory damages against Albrecht, Yeres, Maffia, Centeno, Felton, Brewington, and Fields, jointly and severally, on the § 1983 and § 1985 claims, for a total of $230,-000 in compensatory damages. In addition, the judgment awarded a total of $17,750 in punitive damages against individual defendants as follows: Albrecht, $5,000; Yeres, $4,500; Maffia, $2,000; Centeno, $3,500; Felton, $500; Brewington, $750; and Fields, $1,500.

Defendants' motions for judgment as a matter of law or for a new trial were summarily denied. A notice of appeal was filed stating that "defendants New York State Division for Youth, Warren Albrecht, Susan Yeres, Joseph Maffia, Al Fields, Frederick Brewington and Frederick Felton, hereby appeal" from the district court's judgment. Cornwell's cross-appeal followed.

## II. DISCUSSION

On appeal, the individual appellants, all of whom were adjudged liable for compensatory and punitive damages on the claims under § 1983 and § 1985, contend principally (1) that the original complaint, to the extent it asserted those claims, was time-barred because it was filed more than three years after the last of the 1981–1983 incidents of which Cornwell complained; and (2) that even if the original complaint was timely, the amended complaint was not timely and under Fed.R.Civ.P. 15(c) could not, with respect to the individual appellants, be held to relate back

to the date of the original complaint because they were not named as defendants in the original complaint. DFY, Albrecht, Yeres, and Maffia, the only appellants adjudged liable on the Title VII claims, contend that to the extent that Cornwell asserts Title VII claims based on conduct that occurred in 1986, her amended complaint is time-barred because it was not filed within 90 days after she received from EEOC a right-to-sue letter with respect to those events. In the alternative, all appellants contend that Cornwell failed to prove her claims at trial and that they were entitled to judgment as a matter of law, or at least to a new trial. For the reasons below, we find merit only in the individual appellants' contention that the requirements of Rule 15(c) for relation back of the amended complaint were not met and that the claims against them under §§ 1983 and 1985 should be dismissed on statute-of-limitations grounds.

■ We note that no notice of appeal was filed on behalf of Centeno. "The failure to name a party in a notice of appeal is more than excusable 'informality'; it constitutes a failure of that party to appeal," defeating appellate jurisdiction. *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 314, 108 S.Ct. 2405, 2407, 101 L.Ed.2d 285 (1988). *Accord Shatah v. Shearson/American Express, Inc.*, 873 F.2d 550, 552 (2d Cir.1989) (per curiam). Though a generic statement such as "defendants appeal" may suffice to give notice that each defendant appeals, *see Association of American Medical Colleges v. Cuomo*, 913 F.2d 55, 55–56 (2d Cir.1990) (per curiam), *cert. denied*, —— U.S. ——, 112 S.Ct. 184, 116 L.Ed.2d 146 (1991); *Baylis v. Marriott Corp.*, 906 F.2d 874, 876–77 (2d Cir.1990) (notice on behalf of "all of the plaintiffs in this action" suffices to cover all plaintiffs), the notice in the present case did not refer to a group or class of parties but rather, as quoted in Part I.F. above, listed DFY and six individuals by name. Centeno was not among them. Accordingly, the judgment against him remains undisturbed.

A. *The Statute of Limitations and the §§ 1983 and 1985 Claims*

The individual appellants contend that the § 1983 and § 1985 claims are time-barred either because the original complaint was filed more than three years after the pertinent events or because the amended complaint did not relate back to the time of the original complaint because the requirements of Rule 15(c) were not met. In opposition to these arguments, Cornwell does not dispute that the statute of limitations governing § 1983 and § 1985 actions is three years, but she argues principally (1) that the defendants' conduct constituted a continuing wrong, the last acts of which occurred within three years of the filing of the original complaint, and (2) that the amended complaint related back to the date of the original complaint. She also contends that the individual appellants have waived their argument that the amended complaint did not meet the relation-back requirements of Rule 15(c) because they did not make that argument in the district court. For the reasons below, we agree with Cornwell that defendants' policies and conduct constituted a continuing wrong and that the original complaint was therefore not barred by the three-year statute of limitations. However, we conclude that the individual appellants' relation-back argument has merit.

1. *The Timeliness of the Original Complaint*

■ Under federal law, which governs the accrual of claims brought under §§ 1983 and 1985, *see, e.g., Morse v. University of Vermont*, 973 F.2d 122, 125 (2d Cir.1992), a claim generally accrues once the " 'plaintiff knows or has reason to know of the injury which is the basis of his action,' " *Singleton v. New York*, 632 F.2d 185, 191 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981), (quoting *Bireline v. Seagondollar*, 567 F.2d 260, 263 (4th Cir. 1977), *cert. denied*, 444 U.S. 842, 100 S.Ct. 83, 62 L.Ed.2d 54 (1979)). When a plaintiff experiences a " 'continuous practice and policy of discrimination,' " however, " 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.' " *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir.1992) (quoting *Miller v. International Telephone &*

*Telegraph Corp.,* 755 F.2d 20, 25 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985)); *see also Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 274 (2d Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982) (*"Association Against Discrimination in Employment"*). While discrete incidents of discrimination that are not related to discriminatory policies or mechanisms may not amount to a continuing violation, *see, e.g., Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, —— L.Ed.2d —— (1994), a continuing violation may be found where there is proof of specific ongoing discriminatory polices or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.

■ Where a continuing violation can be shown, the plaintiff is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period. *See Association Against Discrimination in Employment,* 647 F.2d at 274; *Acha v. Beame,* 570 F.2d 57, 65 (2d Cir.1978). In *Association Against Discrimination in Employment,* for example, we considered whether the plaintiffs had filed their administrative complaint with EEOC within the required 300–day period, *see* 42 U.S.C. § 2000e–5(e) (after charges filed with local agency, complaint to EEOC must be filed "within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings"), with respect to conduct that had occurred years before that filing. We held that a consistent pattern of discriminatory hiring practices from 1971 to 1975 constituted a continuing violation and that the plaintiffs' claims accrued in 1975 when the "last act" of discrimination occurred. Thus, we concluded that plaintiffs' 1975 filing with the EEOC was timely even with respect to claims arising from discriminatory hiring from 1971 to 1973.

■ In the present case, the district court correctly ruled that the discrimination and harassment suffered by Cornwell was a continuing violation that began in 1981 and did not end until she finally left MacCormick in 1986. This ruling was supported by the same evidence that established her hostile-environment claim, which required her to show harassment "sufficiently severe or pervasive 'to alter the conditions of [her] employment and create an abusive working environment,'" *see generally Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). The district court found that defendants' personnel policies discriminated on the basis of gender and that Cornwell suffered race- and gender-based harassment that DFY and its supervisory personnel permitted to continue. It found that in 1986 Cornwell suffered the same kinds of harassment at the hands of some of the same YDAs, and under the aegis of some of the same supervisory personnel, as in 1981–1983. The court found that the only reason the harassment had not continued in the interim between February 1983 and March 1986 was Cornwell's absence on account of the illness precipitated by the first set of incidents. Against the background of DFY's gender-discriminatory policies and the hostile work environment created by those male YDAs who sought to rid MacCormick of female YDAs, the court properly concluded that the acts of discrimination and harassment by the individual defendants constituted a continuing wrong that did not end until April 1986, when Cornwell was finally driven from MacCormick for good. Cornwell's original complaint, filed in June of that year, was therefore timely.

### 2. *The Relation Back of the Amended Complaint*

■ The timeliness of the original complaint does not resolve the statute-of-limitations question with respect to the individual appellants, however, for the original complaint did not name them as defendants. Since the last act complained of occurred in April 1986 and the amended complaint was filed in 1992, well beyond the applicable

three-year limitations period, the amended complaint was timely with respect to the individual appellants only if it related back to the date of the original complaint.

The question of relation back is governed by Fed.R.Civ.P. 15(c). At the time this action was commenced, Rule 15(c) provided, in pertinent part, as follows:

(c) **Relation Back of Amendments.** Whenever the claim òr defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. *An amendment changing the party against whom a claim is asserted relates back if* the foregoing provision is satisfied and, within the period provided by law for commencing the action against *the party to be brought in by amendment* that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (2) *knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.*

Fed.R.Civ.P. 15(c) (effective through November 30, 1991) (emphasis added). Effective December 1, 1991, the Rule was amended in response to the decision of the Supreme Court in *Schiavone v. Fortune,* 477 U.S. 21, 29, 106 S.Ct. 2379, 2384, 91 L.Ed.2d 18 (1986), in certain respects that are not pertinent here. As amended, the Rule continues to provide that when a party is added by an amended complaint, the amended complaint relates back as to that party only if

the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) *knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.*

Fed.R.Civ.P. 15(c) (as amended) (emphasis added).

While we express no view as to whether the individual appellants in this case had sufficient notice of the action in 1986 to escape any prejudice in maintaining whatever defenses they had on the merits, we think it abundantly clear that the emphasized portion of the Rule was not satisfied. The requirement that a new defendant "knew" he was not named due to a mistake concerning identity presupposes that in fact the reason for his not being named was a mistake in identity. Cornwell, however, does not allege that she would have named the individual appellants as defendants in her original complaint but for a mistake concerning identity. Nor, in light of the record in the present case, would such an assertion be tenable. Plainly she knew the identities of the DFY employees who she contended had harassed and discriminated against her. Further, an exhibit to the original complaint identified those individuals and set out details of their alleged misconduct. Cornwell was not required to sue them, and her failure to do so in the original complaint, in light of her obvious knowledge and the detailed nature of that pleading's exhibit, must be considered a matter of choice, not mistake.

 It is true that in the district court the defendants did not articulate this aspect of their relation-back argument with clarity. It is plain, however, that they raised the statute-of-limitations defense in their answers and that they thereafter moved for dismissal on the basis of that defense, arguing both that the original complaint was untimely and that the amended complaint did not relate back. The court denied their motions, stating that the amended complaint related back to the date of the original complaint and noting that the the same individuals were alleged in both pleadings to have committed the discriminatory acts, but apparently not realizing that though those allegations were made, those individuals had not originally been sued. We conclude that the matter of relation back was sufficiently before the district court that we should not conclude that the individual appellants waived it.

B. *The Timeliness of the Title VII Claims Arising in 1986*

 DFY, Albrecht, Yeres, and Maffia, pointing out that Cornwell received a right-

to-sue letter from EEOC in 1987 for her Title VII claims of discrimination with respect to her 1986 tour of duty at MacCormick, contend that those claims are time-barred because Cornwell made no motion to file an amended complaint asserting those claims until 1989, *i.e.*, more than 90 days after the issuance of the right-to-sue letter. Cornwell contends, supported by EEOC as *amicus curiae*, that because the new allegations of discrimination were reasonably related to the original allegations of discrimination, she was not required to obtain a new right-to-sue letter and hence the receipt of such a letter did not impose a new time constraint on her. We agree.

A Title VII claimant may file suit in federal court only if she has filed a timely complaint with EEOC and obtained a right-to-sue letter. *See* 42 U.S.C. §§ 2000e–5(e) and (f). Such a suit must be commenced not more than 90 days after receipt of the right-to-sue letter. *See* 42 U.S.C. § 2000e–5(f)(1). In an action in which these procedural requirements have been satisfied, the plaintiff may raise any claim that is "reasonably related" to those asserted in the EEOC filing, even if that claim was not expressly addressed by EEOC. *See, e.g., Owens v. New York City Housing Authority*, 934 F.2d 405, 410–11 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991); *Almendral v. New York State Office of Mental Health*, 743 F.2d 963, 967 (2d Cir.1984).

We have concluded in Part II.A.1. above that the challenged conduct that occurred in 1986 was part of a continuing course of discriminatory conduct initiated during Cornwell's 1981–1983 tour of duty. *A fortiori*, the 1986 conduct was "reasonably related" to the earlier conduct. Accordingly, Cornwell could have amended her original complaint to assert the claims of 1986 wrongdoing even if she had not filed additional charges with EEOC. Since this is so, we can see no basis in Title VII or in reason for concluding that the agency's response to her unnecessary administrative claim imposed on her time constraints to which she would not have been subject had she not filed the unnecessary claim. A contrary, "technical" reading of a remedial statute such as Title VII "would be particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Brown v. Continental Can Co.*, 765 F.2d 810, 813 (9th Cir.1985) (internal quotes omitted).

## C. The Sufficiency of the Evidence on the Title VII Claims

■ DFY, Albrecht, Yeres, and Maffia contend that the evidence was insufficient to support the jury's advisory verdict and the district court's findings of fact with respect to Cornwell's disparate-treatment claims. This contention need not detain us long.

■ A trial court's findings of fact may not be set aside unless they are clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Findings of discrimination, discriminatory intent, and causation are findings of fact, *see, e.g., id.* at 573, 105 S.Ct. at 1511 (discrimination); *Pullman–Standard v. Swint*, 456 U.S. 273, 287–90, 102 S.Ct. 1781, 1789–91, 72 L.Ed.2d 66 (1982) (discriminatory intent); *United States v. Yonkers Board of Education*, 837 F.2d 1181, 1218 (2d Cir. 1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988), and are subject to review under the "clearly erroneous" standard. Similarly, whether a given employment policy evinces an intent to discriminate and whether reasons advanced by an employer are pretextual are "pure questions of fact," findings as to which are to be reviewed under the same standard. *Krieger v. Gold Bond Building Products*, 863 F.2d 1091, 1098 (2d Cir.1988).

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. at 574, 105 S.Ct. at 1511. Similarly, if "a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 575, 105 S.Ct. at 1512.

Given the evidence of DFY's policies recounted in Part I above, and the evidence of Cornwell's repeated requests to Albrecht, Yeres, Maffia, and Centeno, her superiors at DFY, for remedial action, requests that rarely led to any disciplinary action and led to no surcease in the harassing conduct, we cannot conclude that the trial court's findings with respect to Cornwell's claims of discriminatory treatment are clearly erroneous.

## CONCLUSION

We have considered all of the arguments of Cornwell in support of the timeliness of her claims against the individual appellants under §§ 1983 and 1985, and all of the arguments of DFY, Albrecht, Yeres, and Maffia in opposition to Cornwell's claims under Title VII, and have found them to be without merit. For the foregoing reasons, the judgment in favor of Cornwell against Albrecht, Yeres, Maffia, Felton, Brewington, and Fields on the claims under § 1983 and § 1985 is reversed, and the matter is remanded for the entry of judgment dismissing those claims as to those defendants. The judgment in favor of Cornwell against DFY, Albrecht, Yeres, and Maffia for $175,000 on the claims under Title VII is affirmed. The judgment against Centeno, who did not appeal, remains undisturbed.

The cross-appeal is dismissed as moot.

Costs are awarded to Cornwell against DFY, Albrecht, Yeres, and Maffia with respect to the Title VII claims. As to the other claims, each party shall bear her or his own costs.