85 F.3d 89
 65 USLW 2028, 11 IER Cases 1313
 The CONNECTICUT LIGHT & POWER COMPANY, dba Northeast
Utilities Service Company, Petitioner,
v.
SECRETARY OF the UNITED STATES DEPARTMENT OF LABOR, Respondent,
John Delcore, Intervenor.
 No. 776, Docket 95-4094.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 18, 1996.
Decided May 31, 1996.
 
 Charles C. Thebaud, Jr., Morgan, Lewis & Bockius, Washington, DC, for Petitioner.
 Anne Payne Fugett, Attorney, U.S. Department of Labor, Washington, DC (Thomas S. Williamson, Jr., Solicitor of Labor; Gail V. Coleman, Deputy Associate Solicitor; and William J. Stone, Counsel for Appellate Litigation, U.S. Department of Labor, Washington, DC, of counsel), for Respondent.
 Frederick P. Amore, Branford, Connecticut, for Intervenor.
 Before: KEARSE, WALKER, and HEANEY,* Circuit Judges.
 HEANEY, Senior Circuit Judge:
 
 
 1
 The Secretary of Labor held that an employer's proffering of a settlement agreement containing provisions that would have restricted its employee's access to judicial and administrative agencies violated Section 210 of the Energy Reorganization Act of 1974 ("ERA"), 42 U.S.C. § 5851(a) (1988). The employer appeals the decision claiming that former employees are not covered by the ERA, proffering a settlement agreement does not constitute adverse action, and the statute of limitations period had expired. We affirm.
 
 BACKGROUND
 
 2
 John Delcore was employed by W.J. Barney Corporation ("Barney") as a general electrical foreman from July 1985 until September 1987. Delcore supervised subcontracting work at the Millstone Nuclear Power Plant, which is operated by the Connecticut Light & Power Company ("CL & P"). On September 14, 1987, Delcore was terminated by Barney. Shortly thereafter, Delcore complained to the resident inspector of the Nuclear Regulatory Commission ("NRC") raising various allegations.
 
 
 3
 On September 30, 1988, Delcore commenced an action in state court against Barney and CL & P alleging violation of the Connecticut whistle-blower statute, violation of his free speech rights, wrongful termination of his employment in violation of public policy, tortious interference with his employment contract, and defamation. The defendants removed the action to the United States District Court for the District of Connecticut under diversity jurisdiction.
 
 
 4
 In December 1988, CL & P and Delcore entered into settlement negotiations. As a result of these negotiations, on February 8, 1989, counsel for CL & P sent a written settlement proposal to Delcore's attorney. The proposed settlement included provisions that would have restricted Delcore's ability to provide regulatory agencies with information regarding either CL & P or Barney. On February 9, 1989, Delcore's attorney spoke with CL & P's counsel by telephone and indicated that he had some concerns with respect to the agreement's provisions.[1] On March 28, 1989, Delcore's attorney wrote to CL & P's counsel expressing his concern that the proposed settlement agreement was overbroad and overly restrictive. He attached a marked-up version of the proposed settlement agreement indicating which provisions Delcore found problematic. Among the proposed deletions were the provisions that would have restricted Delcore's ability to appear as a witness or a party in any judicial or administrative proceeding in which CL & P or Barney was a party. On April 25, 1989, CL & P terminated negotiations, informing Delcore that further settlement negotiations would not prove fruitful.
 
 
 5
 On May 11, 1989, Delcore filed a complaint with the U.S. Department of Labor. In the complaint, Delcore asserted that as a result of his complaints to the NRC and his suit against Barney and CL & P for wrongful termination, CL & P and Barney had offered him a settlement containing illegal provisions. Specifically, Delcore complained that the agreement violated Section 210 of the ERA because it would have illegally restricted his constitutional rights of free speech and his right to freely report or testify about safety violations or other acts of misconduct by CL & P and Barney. Delcore's initial complaint asserted that the illegal "course of conduct continued from February 1989 through April 25, 1989."[2]
 
 
 6
 On June 8, 1989, the District Director of the Department of Labor issued a letter declining to take action on Delcore's complaint. The District Director stated that the settlement issue was part of the underlying litigation between Delcore and his former employers. Because the underlying dispute was then before a district court, the District Director deemed the matter inappropriate for intervention. He added that the Department of Labor would "not be able to be of service" because thirty days had elapsed between the alleged discrimination and the complaint. Delcore appealed that decision to an Administrative Law Judge ("ALJ").
 
 
 7
 Both in Delcore's hearing memorandum, filed on November 30, 1989, and at the administrative hearing, held on March 13, 1990, Delcore's attorney took the position that the discriminatory behavior occurred on an ongoing basis throughout the settlement negotiations beginning in December 1988 and ending with the termination of negotiations on April 25, 1989. Delcore's memorandum asserted:
 
 
 8
 The continuing offer of the agreement to the Claimant during a series of negotiations is the violation herein. In fact, the insistence of the Respondents to leave the offensive provisions in the agreement is worse than a simple offer of the agreement and a withdrawal of the offer after an initial counter offer by the Claimant. The repeated insistence of the Respondents to retain the illegal provisions of the agreement evidences a predetermined policy and insistence by the Respondents to require the Claimant to waive essential rights of access....
 
 
 9
 (J.A. 170-71). At the hearing before the ALJ, Delcore's attorney asserted:
 
 
 10
 This was not a one time take it or leave it proposition. It was a series of ongoing discussions in January and February. It was reduced to a written offer. The written offer was presented as an invitation for counter offers and continued negotiations; therefore, when the Complainant replied in March of '89 rejecting the particular terms, it was not concluding the series of negotiations, but, in fact, continuing the series of negotiations. Negotiations did not conclude finally until the Respondent's letter in April ... saying no further negotiations are possible.
 
 
 11
 (J.A. 254).
 
 
 12
 On April 24, 1990, the ALJ ruled in favor of the defendant companies. The ALJ held as follows: 1) Section 210 was not applicable because Delcore's employment had been terminated on September 14, 1987, over one year before the alleged discriminatory action; 2) the complaint was untimely because the alleged violation, the settlement offer, occurred in February 1989, months before the complaint was filed; and 3) Delcore had failed to prove that CL & P or Barney had taken retaliatory action against a protected activity. Again, Delcore appealed the decision and briefs were filed with the Secretary of Labor.
 
 
 13
 No further action was taken until April 19, 1995, when the Secretary of Labor, Robert Reich, rejected the ALJ's decision. The Secretary held that Delcore met the statutory definition of employee because the alleged discrimination arose out of the employment relationship, and therefore, the statutory scheme was applicable. The Secretary then found that the provisions in question were particularly restrictive, contrary to public policy, and intended to deprive Delcore of his participation rights under the ERA. As a consequence, the Secretary determined that the proposed settlement provisions were adverse actions prohibited by Section 210. In addition, the Secretary held that terminating the settlement negotiations in response to Delcore's refusal to accept the provisions represented a separate and independent violation.[3] Finally, the Secretary held that Delcore's complaint was timely made. In conclusion, the Secretary of Labor ordered CL & P and Barney "to refrain from discrimination, to post and circulate [the] decision, and to compensate Complainant for costs and expenses." CL & P appeals the Secretary's decision with respect to each issue.
 
 ANALYSIS
 
 14
 This action is based on Section 210 of the ERA, a remedial statute intended to shield employees from adverse action taken by their employers in response to employees' complaints of safety violations. Section 210 provides in part:
 
 
 15
 (a) Discrimination against employee
 
 
 16
 No employer, including a [NRC] licensee, an applicant for a Commission license, or a contractor or a subcontractor of a Commission licensee or applicant, may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee)--
 
 
 17
 (1) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C. 2011 et. seq.], or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended;
 
 
 18
 (2) testified or is about to testify in any such proceeding or;
 
 
 19
 (3) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended [42 U.S.C.2011 et. seq.].
 
 
 20
 42 U.S.C. § 5851(a) (1988) (amended 1992).
 
 
 21
 I. Was Delcore an Employee for Purposes of Section 210?
 
 
 22
 The initial question before us is whether Delcore falls within the protected class of "employee" as defined by Section 210. Although there is no dispute that CL & P is an employer as defined by Section 210, CL & P argues that Delcore was not protected by the ERA during the period of negotiations because he had been terminated from his employment more than one year earlier. In his decision, the Secretary of Labor determined that despite Delcore's status as a former employee, he fell within the scope of the term "employee" because the alleged discrimination arose out of the employment relationship. John Delcore, No. 89-ERA-38 (April 18, 1995) (Dep't of Labor) (Final Review) ("Decision & Order"). We review the Secretary's interpretation of the ERA to determine whether it is a permissible construction of the statutory mandate. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); accord Bechtel Constr. Co. v. Secretary of Labor, 50 F.3d 926, 931-32 (11th Cir.1995) (applying Chevron to Section 210).
 
 
 23
 The Secretary grounds his interpretation on two bases: 1) the broad remedial purpose of the statute, and 2) the legislative history of Section 210. The Secretary argues that a narrow interpretation of the term "employee" would frustrate the remedial purpose of the ERA. See Bechtel, 50 F.3d at 932 ("[I]t is appropriate to give a broad construction to remedial statutes such as nondiscrimination provisions in federal labor laws."); Kansas Gas & Elec. Co. v. Brock, 780 F.2d 1505, 1512 (10th Cir.1985) (affirming the Secretary's broad interpretation of protected activity), cert. denied, 478 U.S. 1011, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986). To further support his position, the Secretary cites a passage from the legislative history in which the terms "employee" and "any worker" are used interchangeably, suggesting a loose rather than a strict definition. (Resp't Br. at 22 (citing S.Rep. No. 848, 95th Cong., 2d Sess. 29 (1978), reprinted in 1978 U.S.C.C.A.N. 7303, 7304)). In view of these considerations, the Secretary chose to adopt a broad definition of employee from other analogous statutes that include former employees so long as the alleged discrimination is related to or arises out of the employment relationship. See, e.g., Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 198-200 (3d Cir.) (Title VII), cert. denied, --- U.S. ----, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994); E.E.O.C. v. Cosmair, Inc., L'Oreal Hair Care Div., 821 F.2d 1085, 1088 (5th Cir.1987) (including former employees within definition of employee in the context of the ADEA) (citing Pantchenko v. C.B. Dolge Co., 581 F.2d 1052, 1055 (2d Cir.1978) (per curiam)). We are persuaded that the Secretary's interpretation of employee is a permissible construction as required by the Chevron analysis.
 
 
 24
 In his Decision and Order, the Secretary went on to find that the alleged discrimination, offering a settlement agreement containing improper gag provisions, arose out of the employment relationship. We will reverse the Secretary's finding of fact only if it is unsupported by substantial evidence. See Administrative Procedure Act, 5 U.S.C. § 706(2) (1988); Passaic Valley Sewerage Comm'rs v. Department of Labor, 992 F.2d 474, 478 (3d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993). CL & P argues that the factual basis for the Secretary's finding is faulty because "[t]he allegedly discriminatory settlement negotiations took place to resolve post-employment litigation initiated by Mr. Delcore." (Pet'r Br. at 32-33). This argument either ignores the thread of continuity between the employment dispute and the litigation or suggests that litigation activity is always beyond the scope of the employment relationship. In either case, we reject this position and affirm the Secretary's finding as substantially supported by the evidence.
 
 
 25
 II. Did the Gag Provisions Constitute Adverse Action?
 
 
 26
 We next turn to the issue of whether proffering a settlement agreement, whereby an employer attempts to restrict an employee's ability to cooperate with administrative and judicial bodies, violates Section 210 of the ERA.[4] The settlement agreement's provisions that form the basis of this action would have 1) prohibited Delcore from appearing or encouraging another from appearing as a voluntary witness or party in any judicial or administrative proceeding against CL & P or Barney, 2) required Delcore to resist compulsory process, and 3) restricted both the substance and manner in which Delcore communicated with the NRC.
 
 
 27
 In his Decision and Order, the Secretary found that the gag provisions in question were "particularly restrictive" and constituted adverse action in violation of Section 210. Pointing to a memorandum prepared by the NRC general counsel stating that "Section 210, as a matter of national policy, provides special protection to employees or former employees who engage in the activities protected by Section 210(a) ...," the Secretary concluded that relinquishing these rights in exchange for financial considerations would be illegal and contrary to public policy. Decision & Order at 9 (citing 135 Cong.Rec. 27,836 (1989)). Noting that the ERA whistle-blower provision is modeled on the Mine Safety and Health Act of 1977 (Mine Act), 30 U.S.C. § 815(c) (1988), see Mackowiak v. University Nuclear Sys., Inc., 735 F.2d 1159, 1163 (9th Cir.1984), the Secretary also pointed to the broad interpretation of the Mine Act's protective scope. See Secretary of Labor v. Mullins, 888 F.2d 1448, 1452 (D.C.Cir.1989). The Secretary reasoned that the ERA should be similarly construed to protect employees against this improper activity pursuant to its remedial objectives.
 
 
 28
 CL & P argues that the challenged activity did not discriminate against Delcore with respect to his terms of employment as required by the statutory language, but rather arose from Delcore's post-termination lawsuit. (Pet'r Br. at 33). This argument is specious. Delcore's lawsuit alleged that he had been terminated in violation of the terms of his employment, terms stipulated contractually and statutorily. The settlement agreement was an attempt to resolve the final terms of Delcore's employment. Although CL & P acknowledges "[t]hat the subject matter of the litigation generally concerned events related to Mr. Delcore's employment," id., it asserts that the litigation should not be treated as though it arose from the employment relationship. This assertion denies simple facts. As CL & P would have it, once an employment conflict degenerates to the point of formal litigation, the tactics employed by the litigants would be protected from the legal constraints imposed by the ERA. We disagree.
 
 
 29
 As its fall-back position, CL & P argues that the proposal of a settlement agreement containing such provisions could not have constituted adverse action because Delcore was free to reject the proposal. This characterization of adverse action not only oversimplifies subtle, implicit, discriminatory action, but is contrary to the expansive scope of the ERA. Cf. Mullins, 888 F.2d at 1452 (holding that an offer to reemploy under illegal conditions violated Mine Act anti-discrimination provision). Although the act of inducing an employee to relinquish his rights as provided by the ERA through means of a settlement agreement is less obvious than more direct action, such as termination, it is certainly aimed at the same objective: keeping an employee quiet.[5]
 
 
 30
 The Secretary concluded that the settlement gag provisions were an act adverse to Delcore's statutory rights, thereby violating the anti-discrimination provisions of the ERA. Again, we review the Secretary's interpretation of Section 210 to determine whether it is a permissible construction of the congressional mandate. See Chevron, 467 U.S. at 843, 104 S.Ct. at 2781. In this case, CL & P sought to impose these improper conditions on the final terms of its employment relationship with John Delcore. The fact that it did so under the cover of a litigation strategy is irrelevant. Therefore, we hold that the Secretary's interpretation is permissible and affirm the decision.
 
 III. Statute of Limitations
 
 31
 Finally, we turn to whether Delcore's complaint was timely made. During the period in question, an employee had thirty days from the occurrence of a violation to file a complaint under the ERA. 42 U.S.C. § 5851(b) (1988); 29 C.F.R. § 24.3(b) (1989). CL & P asserts that Delcore's complaint should be time-barred because it was filed more than thirty days after the settlement agreement was received. Instead, the Secretary of Labor focused on CL & P's April 25th letter breaking off negotiations and held that the complaint was not time-barred.
 
 
 32
 Generally, the limitations period begins to run from the date that a complainant learns of the employer's final decision. Delaware State College v. Ricks, 449 U.S. 250, 259, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980) (Title VII); see also English v. Whitfield, 858 F.2d 957, 961 (4th Cir.1988) (applying Ricks to § 210). Application of the rule in this case, however, is inappropriate given the nature of the violation: The adverse action in question is not a discrete decision taken by an employer, but rather a negotiation tactic, employed over a period of months, by which CL & P and Barney attempted to coercively induce Delcore into relinquishing or restricting his ability to provide federal regulatory agencies information regarding potential safety violations. Consideration of limitations periods requires a fair and reasonable weighing of the conflicting concerns of the remedial intent of the ERA and the desire to keep stale claims out of the courts. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 380, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982). As such, we consider application of the "continuing violation" exception to this case.
 
 
 33
 Under the continuing violation standard, a timely charge with respect to any incident of discrimination in furtherance of a policy of discrimination renders claims against other discriminatory actions taken pursuant to that policy timely, even if they would be untimely if standing alone. Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). A continuing violation exists where there is a relationship between a series of discriminatory actions and an invalid, underlying policy. See Cornwell v. Robinson, 23 F.3d 694, 703-04 (2d Cir.1994). Thus, in cases where the plaintiff proves i) an underlying discriminatory policy or practice, and ii) an action taken pursuant to that policy during the statutory period preceding the filing of the complaint, the continuing violation rule shelters claims for all other actions taken pursuant to the same policy from the limitations period.
 
 
 34
 In this case, Delcore alleges a practice by which his employers used the carrot of a settlement agreement to impose discriminatory restrictions on employees' rights to report to regulatory agencies. CL & P admits as much when describing the provisions in question as commonplace. Therefore, the first prong of this exception is met.
 
 
 35
 The second prong of the inquiry focuses on whether the defendants took some action pursuant to this policy within the thirty days preceding May 11, 1989. The Secretary asserts that the policy of imposing these discriminatory restrictions occurred throughout the negotiating process, a process which was not terminated until April 25, 1989. The proposed provisions were part and parcel of the entire negotiation process. Thus, so long as the negotiation process continued, the adverse action persisted, and the violation continued. Moreover, CL & P revoked the settlement agreement on April 25, an act made pursuant to its discriminatory policy and within the limitations period. Therefore, the second prong of the continuing violation test is met.
 
 
 36
 CL & P attempts to constrain the duration of the adverse action to the receipt of the written settlement agreement by Delcore. This position fails to acknowledge, however, that CL & P continued to insist throughout the negotiations that Delcore relinquish his right to provide agencies with information; the written proposal merely evidences, exactly and concretely, the extent of that demand.
 
 
 37
 Even if we were to focus on the written proposal, CL & P's argument would still fail. Pointing to principles of contract law, CL & P suggests that although the violation might not be limited to its transmission of the written proposal on February 8, 1989, its effectiveness would continue only as long as the offer was open. Traditional contract theory and Connecticut law provide that an offer is extinguished upon a counteroffer, see Cavallo v. Lewis, 1 Conn.App. 519, 473 A.2d 338, 340 (1984) (per curiam). CL & P argues that the March 28 letter constituted such a counteroffer and extinguished their offer. Thus, according to this analysis, the commencement of the limitations period would have occurred when Delcore's attorney replied on March 28 that the proposal was overly restrictive.
 
 
 38
 Accepting arguendo that the violation consisted solely of the written settlement offer, CL & P's argument fails nonetheless because under principles of contract law, an offer is not extinguished where such a reply merely requests modification. See E. Allan Farnsworth, Contracts § 3.20 (2d ed. 1990) ("But a mere request for modification ... does not ordinarily [extinguish the offer]."). It is undisputed that on February 9, 1989, defendants' counsel "suggested that the proposed settlement should be presented to Mr. Delcore for his review as originally drafted and that counsel could thereafter work out appropriate language to resolve objections." (Stip. 10.) The March 28 letter was not a rejection of the offer, but rather a request to modify the language of the proposed settlement pursuant to the offeror's suggestion. Thus, the proposed settlement agreement remained on the table until revoked by CL & P on April 25, 1989.
 
 
 39
 That being said, however, we view the violation to encompass the negotiations process as a whole, and not just one particular product of the negotiations. The discussion of offer and rejection, while preclusive with respect to CL & P's argument, misses the appropriate timing focus--the negotiation tactic employed by CL & P throughout the process. Therefore, we hold that the Secretary properly ruled that the complaint was timely because the last act pursuant to an ongoing, discriminatory policy occurred within the statutory period when CL & P revoked its outstanding settlement offer on April 25.
 
 CONCLUSION
 
 40
 Therefore, for the above-stated reasons, we affirm the Secretary's decision that proffering a settlement agreement containing provisions restricting an employee's access to judicial and administrative agencies violates Section 210.
 
 WALKER, Circuit Judge, dissenting:
 
 41
 Although deference is owed to an agency's interpretation of statutes in its area of "special competence," see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984), here the Secretary of Labor ("Secretary") overstepped his bounds by interpreting § 210 of the Energy Reorganization Act of 1974, 42 U.S.C. § 5851, in an unreasonable manner. Even assuming that a former employee is an "employee" within the meaning of § 210, a proposition with which I do not agree, it is plain to me that the Secretary erred in concluding that Connecticut Light & Power ("CL & P") engaged in an "adverse employment action" against Delcore within the meaning of the ERA.
 
 
 42
 A. Is Delcore an "employee?"
 
 
 43
 The majority and I agree that the first question for resolution is whether Delcore falls within the protected class of "employee" as defined by § 210. CL & P argues that Delcore is not an "employee" within the meaning of the ERA both because his employment was terminated more than a year before he filed his § 210 complaint, and because he was the employee of a subcontractor that had performed work at a CL & P-owned nuclear plant and he never worked directly for CL & P. Although Delcore's employment by a subcontractor does not, standing alone, take Delcore outside the scope of § 210 protection, see Adams v. Dole, 927 F.2d 771, 777 (4th Cir.), cert. denied, 502 U.S. 837, 112 S.Ct. 122, 116 L.Ed.2d 90 (1991), I think that his termination from employment prior to the action complained of does.
 
 
 44
 I recognize that in interpreting analogous statutes, some of our sister circuits have held that former employees may be covered where the alleged discrimination against them is related to or arises out of the employment relationship. See, e.g., Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 198-200 (3d Cir.) (Title VII), cert. denied, --- U.S. ----, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994); Passer v. American Chem. Soc'y, 935 F.2d 322, 330-331 (D.C.Cir.1991) (Age Discrimination in Employment Act ("ADEA")); EEOC v. Cosmair, Inc., L'Oreal Hair Care Div., 821 F.2d 1085, 1088 (5th Cir.1987) (ADEA); Dunlop v. Carriage Carpet Co., 548 F.2d 139, 147 (6th Cir.1977) (Fair Labor Standards Act). However, I am not persuaded that Congress intended that former employees fall within the scope of § 210's protection.
 
 
 45
 In Robinson v. Shell Oil Co., the Fourth Circuit held that the definition of "employees" in Title VII's anti-retaliation provision was unambiguous in its exclusion of former employees. 70 F.3d 325, 328-29 (4th Cir.1995) (in banc), cert. granted, --- U.S. ----, 116 S.Ct. 1541, 134 L.Ed.2d 645 (1996). The Fourth Circuit further stated that "courts may stray beyond the plain language of unambiguous statutes" only under "rare and narrow" circumstances such as where "the literal application of statutory language would lead to an absurd result." Id. (declining to apply the exception).
 
 
 46
 Similarly, in Reed v. Shepard, the Seventh Circuit held that a former employee could not make out a prima facie case of retaliation in violation of Title VII where "the alleged retaliatory activities took place after the termination of [her] employment and was therefore not an adverse employment action." 939 F.2d 484, 492-93 (7th Cir.1991). The Reed Court stated: "[I]t is an employee's discharge or other employment impairment that evidences actionable retaliation, and not events subsequent to and unrelated to his employment." Id.
 
 
 47
 The majority suggests that because the terms "employee" and "any worker" are used interchangeably in the legislative history of the ERA, former employees must be covered. This argument is flawed. The plain meaning of the term "any worker" does not include former workers. As the Supreme Court has acknowledged, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). See also United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' " (quoting Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917))). The term "employee" is a straightforward unambiguous one. When one's employment with his employer ends, one ceases to be an "employee." With all due deference to the Secretary, I believe that his conclusion that § 210 applied to persons that once were, but no longer are, employees was unreasonable because the statute is unambiguous.
 
 
 48
 B. Did CL & P engage in an adverse employment action?
 
 
 49
 Even if Delcore, as a former employee, could still be considered an "employee" within the meaning of § 210, I cannot agree with the majority that CL & P engaged in an adverse employment action against him, and believe that the Secretary's determination to that effect to be contrary to law.
 
 
 50
 The action in question--CL & P's making and then, when Delcore refused it, withdrawing a settlement offer--cannot properly be characterized as "adverse" to Delcore because Delcore had no right to a settlement. The notion that § 210 creates a right not to be bothered with a settlement offer that the offeree is free to refuse seems to me nonsensical. The majority suggests that because Delcore had a right not to be terminated from his employment in violation of § 210, he also had a right to a post-termination settlement of his lawsuit against CL & P that did not contain certain gag provisions. I am aware of no precedent for the extraordinary and novel proposition that a litigant has a right to a settlement, nor does the majority cite any. Revealingly, in his brief, Delcore refers not to a "right of settlement" but rather, to a "hope of settlement." Indeed, in his April 1995 order, the Secretary of Labor conceded that CL & P "ha[s] no obligation to settle a claim against [it] and can under normal circumstances break off settlement negotiations for any reason, or no reason at all." The fact that CL & P offered terms of settlement that Delcore indicated were unacceptable and that CL & P then withdrew left Delcore no worse off than he was before settlement negotiations began. I believe that in these circumstances, the Secretary's conclusion that Delcore suffered an employment action that was adverse was contrary to law.
 
 
 51
 Moreover, I cannot agree that what CL & P did here was even an "employment action." The majority claims that the alleged discrimination need only "ar[i]se out of the employment relationship." But the "discrimination" alleged by Delcore arose out of his employment relationship with CL & P only to the extent that there would have been no lawsuit to settle had Delcore not at one time been employed by a subcontractor of CL & P. This connection is too tenuous to support a finding of adverse employment action. The majority states that "[t]he settlement agreement was an attempt to resolve the final terms of Delcore's employment." I cannot agree. At the time of the settlement negotiations, Delcore was no longer employed. Therefore, there were no "terms" to resolve.
 
 
 52
 The situation here is markedly different from that in Secretary of Labor v. Mullins, 888 F.2d 1448 (D.C.Cir.1989), a case on which the majority relies. In Mullins, the District of Columbia Circuit held that an offer by an employer to re-employ a miner under illegal and dangerous conditions constituted a violation of the Mine Safety and Health Act. Id. at 1451-52. Had CL & P offered to re-employ Delcore on the condition that he not report safety concerns, the situation would parallel that in Mullins. In such a case, the "terms" and "conditions" of employment--specifically, hiring--would be affected and there would be an employment action. This is not such a case, however.
 
 
 53
 The majority equates an employer's effort to induce an employee to relinquish his § 210 rights under threat of termination with the attempt to do so by means of a post-termination settlement agreement. The majority claims that both types of actions are "aimed at the same objective: keeping an employee quiet." Although their objectives may be the same, the actions are dissimilar. In the former, the employee is at risk of losing his employment and the employer is seeking to alter the terms of employment. In the latter, a former employee is only at risk of losing, as Delcore's brief puts it, the "hope of settlement" of a post-termination lawsuit. That Congress intended to protect individuals in the former situation, and not in the latter, is in no way inconsistent or problematic.
 
 
 54
 Subsequent to the events of this case, the Nuclear Regulatory Commission ("NRC") promulgated a regulation proscribing restrictive settlement provisions, such as those sought by CL & P from Delcore, with respect to complaints filed with the Department of Labor. I do not take issue with the NRC's authority to promulgate such regulations, particularly when it does so after allowing for notice and comment. I do, however, object to the majority's holding, which is tantamount to approving the Secretary's enforcement of these subsequent regulations upon CL & P for conduct that preceded their promulgation.
 
 
 55
 I respectfully dissent.
 
 
 
 *
 The Honorable Gerald W. Heaney, United States Senior Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The terms of the proposed settlement agreement in question provide:
 7) Mr. Delcore agrees that he will not voluntarily appear as a witness or a party in any judicial or administrative proceeding in which CL & P or Barney or any related companies or organization is a party in interest and that he will not do anything to encourage, suggest or otherwise induce any other party, attorney, administrative agency, or administrative or judicial tribunal to contact, involve, or call Mr. Delcore as a witness or to join Mr. Delcore as a party in such proceeding. Mr. Delcore further agrees that if served with compulsory process seeking to compel his appearance or joinder in such a proceeding, he will immediately notify the undersigned representative of CL & P and Barney, or their successors, in writing and thereafter take all reasonable steps, including such reasonable steps as may be suggested by the representatives of CL & P and Barney, to resist such compulsory process. Notwithstanding any other provisions of this Agreement, activities otherwise proscribed in the preceding language of this paragraph shall not be deemed to constitute a breach of this Agreement if such activities arise out of, relate to, and concern only events that occur after the date on which this Agreement is executed by all parties and any contact, activity, appearance, or testimony is strictly confined to events occurring after the execution of this Agreement by all parties.
 8) Nothing in this Agreement shall be construed to prohibit Mr. Delcore from personally communicating to the United States Nuclear Regulatory Commission ("NRC"), and any person who, at the time of such communication, is a member of the Staff of, and is acting on behalf of, the NRC, any information acquired by him during his employment at the Millstone Station, which relates to any matter at the Millstone Station that Mr. Delcore in good faith believes could adversely affect the public health and safety, so long as the purpose of such communication is to provide the NRC with information necessary to the discharge of its duties to ensure that nuclear power plants are constructed and operated safely. In the event that Mr. Delcore deems it necessary to make such communications to the NRC, he shall refrain from doing so in such a manner calculated or foreseeably likely to have the effect of bringing that fact or substance of such communications to the attention of any party other than the NRC, except that Mr. Delcore shall not be responsible for disclosures made by the NRC itself unless he affirmatively induces the making of such disclosures.
 
 
 [2]
 Although the latter date was initially identified as April 27, 1989, it was subsequently corrected by joint stipulation of fact
 
 
 [3]
 CL & P complains that in finding that breaking off settlement negotiations constituted a second and independent violation of the ERA, the Secretary unlawfully amended Delcore's complaint. After a careful review of the entire record, we agree that this issue was not litigated by the parties, and therefore, the Secretary's finding with respect to this independent action was improper and is vacated
 
 
 [4]
 We note that in October 1993, subsequent to the events in question, the NRC promulgated a regulation expressly prohibiting the proffering of a restrictive settlement agreement. The regulation provides:
 No agreement affecting the compensation, terms, conditions, or privileges of employment, including an agreement to settle a complaint filed by an employee with the Department of Labor pursuant to section 211 [formerly 210] of the Energy Reorganization Act of 1974, as amended, may contain any provision which would prohibit, restrict, or otherwise discourage an employee from participating in protected activity as defined in paragraph (a)(1) of this section including, but not limited to, providing information to the NRC or to his or her employer on potential violations or other matters within NRC's regulatory responsibilities.
 
 
 [10]
 C.F.R. 50.7(f) (1995). Given that this express prohibition was promulgated after the events in question, we consider the Secretary's decision in light of the law as it stood in 1990
 
 
 [5]
 The dissenting opinion bases its criticism of our opinion on its observation that Delcore had no right to a settlement. Despite the dissent's assertion to the contrary, we do not now suggest the novel proposition that such a right exists. What our opinion does recognize, however, is that employees have the right to be free from discriminatory action meant to deprive them of their statutory rights. While in this case, Delcore may have rejected the settlement, thereby maintaining his prerogative to communicate with the NRC, the behavior of employers to foist such restrictions on the employees through the guise of a choice does constitute adverse action with respect to an employee's rights to communicate with regulatory agencies. Although the dissent suggests that Mullins presents a very different and distinguishable case, we find it's reasoning applicable in this case. Under the dissent's rationale, the offer of reemployment in Mullins would not have constituted a violation of the Mine Act because the offer merely represented a choice which the former employee was free to refuse. Clearly, the circuit court there, as we do here, recognized that this kind of discriminatory action, albeit more subtle in its form than the more obvious act of termination, can represent a significant threat to the statutory purpose of ensuring clear lines of communication between employees and regulatory agencies. The dissent's view in our judgment would undermine Congress' broad remedial purpose in enacting the ERA