**Marianne RUCCI, Plaintiff,**

v.

**Robert D. THOUBBORON, individually, Robert Le Fever, individually, Gerald P. Butler, individually, Patrick J. Brophy, individually, Jeremiah O'Connor, individually, Donald Killarney, individually, Harold Turner, individually, and the County of Putnam, Defendants.**

**No. 97 Civ. 0296(WCC).**

United States District Court,
S.D. New York.

Sept. 30, 1999.

As Amended *nunc pro tunc*
October 5, 1999.

Lovett & Gould, White Plains, New York (Kim Berg, of counsel), for plaintiff.

Bank, Sheer, Servino & Seymour, White Plains, New York (Daniel A. Seymour, of counsel), for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Marianne Rucci alleges, pursuant to 42 U.S.C. § 1983 (§ 1983), a violation of her Fourteenth Amendment right to equal protection, claiming that the defendants discriminated against her because of her gender. Plaintiff also alleges that defendants have abridged her First Amendment rights, specifically her freedom of speech, the right to petition government for the redress of grievances, and her freedom of association, each in violation of § 1983. Finally, plaintiff alleges a § 1983 claim for a violation of her Fourth Amendment rights.[1] Each of the defendants, Robert D. Thoubboron, Robert Le Fever, Gerald P. Butler, Patrick J. Brophy, Jeremiah O'Connor, Donald Killarney, Harold Turner, and the County of Putnam ("the defendants") here make a joint motion to dismiss the complaint in its entirety pursuant to Federal Rule of Civil Procedure 56. For the reasons stated herein, the motion is granted as to the § 1983 equal protection claim in regard to defendants Killarney, O'Connor, Brophy, Le Fever, and Butler, but denied in regard to defendants Turner, Thoubboron, and the County. Moreover, plaintiff's § 1983 claims under the First and Fourth Amendment are dismissed in their entirety.

## BACKGROUND

Plaintiff was a corrections officer, employed by the County of Putnam ("the County") from 1990 until she was fired in 1997. Each of the individual defendants named in the amended complaint were officers superior to plaintiff. Killarney was employed by the Putnam County Sheriff's Department ("the Department") as an investigator, and Turner was the County's chief criminal investigator. Le Fever and O'Connor were, at all times relevant to this complaint, employed by the Department as sergeants. Butler was a captain in the Department, Brophy was the County's Undersheriff, and Thoubboron was the elected Sheriff. Plaintiff has also named the County as a defendant.

Plaintiff alleges numerous forms of mistreatment during the course of her employment with the Department. First, in January of 1991, plaintiff alleges that Le Fever told her that pregnancy would not be tolerated by the Department. After this departmental attitude toward pregnancy was allegedly confirmed by plaintiff's shift supervisor, Anton Tino, plaintiff decided to have an abortion. Then, in August of 1992, plaintiff alleges that Thoubboron chose to pass her over for a promotion and promoted three male employees instead. Plaintiff further claims that in December of 1992, Butler contacted plaintiffs physician while she was out on disability and "pressured" him into permitting plaintiff to return to work. Further, while out on disability leave, plaintiff refused to sign a blanket authorization to permit the Department access to all of her medical records, and she therefore was removed from disability status and

---

1. Plaintiff voluntarily seeks to dismiss her federal claim under 42 U.S.C. § 1985, *see* September 9, 1999 Letter to the Court, as well as each of her state law state claims for discrimi-

nation, false arrest, and malicious prosecution. *See* Plaintiff's Memorandum of Law at fn. 1. These claims are hereby dismissed.

charged with the loss of sick days instead. Plaintiff filed a grievance through her union, and exercised her right to a hearing under New York state law, and her sick leave accruals were eventually credit back to her.

In December of 1992, after becoming pregnant a second time, plaintiff claims that a supervisor, who is not a defendant in this lawsuit, ordered her to be weighed. In the same month, plaintiff alleges that O'Connor told her that she would be fired for getting pregnant. Shortly thereafter, plaintiff was injured when she tripped at work, and she alleges that Le Fever and Butler "deliberately" did not ask her about the welfare of her fetus in order to reaffirm their "negative attitude towards pregnancy." *See* Plaintiff's Amended Complaint at ¶ 26.

For the majority of 1993, plaintiff was out on either disability or maternity leave. However, in February of 1993, Thoubboron ordered her to return to work, but plaintiff refused until her own doctor cleared her to do so. Plaintiff eventually agreed to return to work, but, shortly thereafter, again returned to disability leave. Then, in January of 1994, plaintiff claims that Brophy, acting under orders from defendant Turner, forced plaintiff to remain confined from 9:00am to 5:00pm in her home while out on disability. He also required plaintiff to report every Monday to the Department for a discussion on her medical status. Plaintiff filed a complaint protesting these conditions with the Public Employee Relations Board. Soon thereafter, plaintiff was ordered to return to work on light duty in March of 1994, at which time she again elected to exercise her right to a hearing, claiming that she was unable to return to work.

In July 1994, plaintiff returned to "light duty," but she claims that defendants "regularly visited upon plaintiff petty affronts, calculatedly demeaning refusals to act on vacation requests, [and] unprecedented denials of request for personal leave ..." Plaintiff's Rule 56.1 Statement at ¶ 140. It is somewhat unclear from both the pleadings and the briefs as to which, if any, of the defendants these generalized complaints relate to, but plaintiff did file a grievance regarding the denial of a vacation request in August of 1994.

In December 1994, while plaintiff was working alone in the correctional facility's control room, a "touch-screen" monitor shattered. In response, Butler and Killarney engaged in a lengthy interrogation of plaintiff, informing her that she was suspected of intentionally breaking the monitor, and would be the subject of a felony investigation. These defendants later gave plaintiff a *Miranda* warning, at which time plaintiffs attorney advised her to exercise her right to remain silent. Two weeks later, a second monitor shattered when plaintiff was not present, and, realizing that the computers were defective, defendants terminated their investigation of plaintiff.

Additionally, plaintiff complains that on the day she learned of this investigation, she became upset and decided to leave work early. Before leaving, plaintiff filled out a "Leave Slip," writing "mental duress" on the form to explain why she was leaving early. The next day, according to plaintiff, Brophy, acting on behalf of Thoubboron, hand delivered a letter to plaintiff stating that she should return to work immediately. Plaintiff returned to work, but, the following day, was ordered by defendant O'Connor to re-draft her "Leave Slip" so as to omit the phrase "mental duress." Plaintiff refused. She alleges she then heard O'Connor tell Le Fever, in reference to plaintiffs refusal, "Throw her on midnights, watch her jump and down."

Plaintiff also alleges that sometime in 1994, she refused to use a locker for fear that the defendants would place contraband in it so as to "frame her." She claims that O'Connor, acting on orders from Butler, threatened to bring her up on disciplinary charges in the event that the

clothes hanger (which plaintiff used instead of a locker) was damaged. Plaintiff complained about this to Butler, and told him of O'Connor's prior comments related to her pregnancy. Plaintiff then had a second meeting related to these allegations with Butler and Turner on February 15, 1995. Turner asked plaintiff if she had recently written an anonymous letter accusing O'Connor of inappropriate sexual behavior, and plaintiff responded affirmatively. Turner took exception to plaintiff's decision to write an unsigned letter, and, according to plaintiff, intimated that she should resign or could be fired.

Plaintiff also claims that in July of 1995, Butler and Le Fever called her to a meeting and informed her that she would be assigned to a midnight tour in the new female correctional facility. The next day, plaintiff learned that several junior, officers, whom she asserts were more junior to her, were promoted, while plaintiff was not.

Because of alleged on-the-job stress related to these incidents, plaintiff took unpaid leave from the Department in 1995. When she was ready to return to work, she was notified that she was would not be able to return until a County physician cleared her, but the Department's delay in scheduling this exam forced her to remain out of work for several more weeks. Plaintiff brought a grievance for the loss of salary while awaiting this exam, and rather than continuing with arbitration, the Department paid plaintiff for this lost time.

Finally, plaintiff alleges, and the defendants do not dispute, that in September of 1996, Butler and Turner informed plaintiff that she was facing felony charges for

tampering with public records in the first degree. These allegations related to an incident that occurred on June 13, 1996, while plaintiff was working in the correctional facility. While on duty, officers are required to make rounds of the prison every fifteen minutes, and then indicate in their log that the rounds have been completed. It appears that for a period of a few hours, plaintiff arranged to have a fellow officer make her rounds so that she could take a nap. According to the defendants, however, plaintiff still indicated in her log that she had completed the rounds. Plaintiff was arrested, terminated immediately without pay, and arraigned. While the grand jury chose not to indict plaintiff for this incident, the defendants still pursued a disciplinary hearing against her based upon these charges, and she was ultimately fired after a hearing on the matter.[2]

## DISCUSSION

### I. Summary Judgment Standard

A district court may grant summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact, *Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir.1996), and the movant is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a

---

**2.** While we have enumerated every affront alleged by plaintiff, we note that the Court is unable to consider some allegations for purposes of this motion. Some of the complaints, such as being weighed by a superior, are made against persons who are not defendants to this action. Others, such as plaintiff's claim that she was forced to see a doctor before returning from disability, and plain-

tiff's claim that defendants "regularly visited upon plaintiff petty affronts, calculatedly demeaning refusals to act on vacation requests, [and] unprecedented denials of request for personal leave ..." provide no information as to which of the defendants these allegations pertain, and we therefore find it impossible to consider these claims in opposition to this motion.

reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). The party seeking summary judgment has the burden of showing that no genuine factual dispute exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

In ruling on a motion for summary judgment, a court "is not to weigh the evidence.... and [is] to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is a "drastic procedural weapon because its prophylactic function, when exercised, cuts off a party's right to present his case to the jury." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir.1988) (internal quotations omitted).

Finally, the court must be particularly cautious about awarding summary judgment to a defendant employer where intent is at issue. *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). We are mindful that in cases where the employer's state of mind or motives are relevant, records of the employer will rarely document such factors, and as such, the materials before us in a summary judgment motion "must be carefully scrutinized" for circumstantial evidence about the employer's state of mind and those factors that motivated the challenged course of action. *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir.1996); *see also Chambers v. TRM Copy Cntrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

## II. *Equal Protection Claim*

### A. *Applicable Standard*

▆ Plaintiff makes no specific attempt to explain the legal basis of her equal protection claim, other than asserting that the defendants mistreated her because she is a woman. Left to surmise as to the nature of plaintiff's purported cause of action, we assume that her gender discrimi-

nation claims under § 1983 fall into one of two categories. First, plaintiff appears to allege disparate treatment; for example, her allegation that the defendants refused to promote her because of her gender would constitute such a claim. To show disparate treatment, plaintiff must prove that defendants intentionally discriminated against her because of her gender. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If plaintiff satisfies this burden, the employer must then "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If this is done, the burden of going forward shifts to the plaintiff "to show that [the employer's] stated reason ... for [its treatment of plaintiff was] in fact pretext." *Id.* at 804, 93 S.Ct. 1817.

▆ Second, it appears that some of plaintiff's claims, such as her complaint that some of the defendants made disparaging comments about pregnancy, are based on a "hostile work environment" theory. Not all sexual harassment constitutes sex discrimination, but "harassment that transcends coarse, hostile and boorish behavior can rise to the level of a constitutional tort." *Annis v. County of Westchester*, 36 F.3d 251, 254 (2d Cir.1994). To determine whether the plaintiff has shown actionable "harassment," the Court may consider the analogous inquiry under Title VII for guidance. *See Boutros v. Canton Regional Transit Auth.*, 997 F.2d 198, 202 (6th Cir.1993); *Cohen v. Litt*, 906 F.Supp. 957, 963–64 (S.D.N.Y.1995).

▆ Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimi-

dating, hostile, or offensive working environment." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304–05 (2d Cir.1995) (internal quotations omitted). In *Harris v. Forklift Sys.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court reaffirmed that to prevail on this type of sexual harassment claim a plaintiff must show that the harassment was " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment.' " *Id.* at 21, 114 S.Ct. 367 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *Tomka*, 66 F.3d at 1305. The determination of whether there is a hostile or abusive environment in the workplace—from both a reasonable person's standpoint as well as the victim's subjective perception—can only be determined by considering the totality of the circumstances. *Tomka*, 66 F.3d at 1305. Given these standards, we will separately analyze the equal protection claim against each of the defendants.

### B. *Killarney*

Plaintiff apparently predicates her allegation of gender discrimination against Killarney solely upon the touch-screen monitor incident. However, because it is clear that the investigation related to that incident was conducted in a good-faith belief that plaintiff had deliberately shattered the monitor, and because plaintiff has made no showing that Killarney's actions were motivated because of her gender, Killarney's motion as to this claim is granted.

By plaintiff's own admission, the monitor spontaneously shattered while she was alone in the correctional facility's control room. Plaintiff's Rule 56.1 Statement at ¶ 170. Killarney, an investigator employed by the Department, was naturally directed by Turner to investigate the incident. Killarney and Butler questioned plaintiff related to the accident on January 5, 1995, and Killarney advised her that she could be facing criminal charges for mischief in the third degree, a felony. On January 11, 1995, plaintiff was ordered to appear for further questioning, and plaintiff met with Killarney and Butler, accompanied by an attorney. After a somewhat lengthy interrogation, Killarney apparently became convinced that plaintiff had maliciously damaged the monitor, and gave plaintiff a *Miranda* warning. At this time, plaintiff's attorney advised her to not answer any more questions, and the interrogation stopped. Finally, on January 14, 1995, when plaintiff was not on duty, another monitor shattered. After this second incident, it became apparent that the monitors were defective, and the investigation against plaintiff was abandoned.

In hindsight, the investigation against plaintiff was highly unfortunate. Plaintiff was interrogated, *Mirandized*, and threatened with felony charges for an act that she did not commit. Killarney, however, was not aided by the benefit of hindsight. He was informed that an employee, who had recently been involved in a series of contentious arguments with her superiors, now claimed that, while alone in the control room, a monitor had spontaneously shattered in her presence. It was reasonable for Killarney to investigate this incident, and even to conclude that plaintiff had intentionally shattered the monitor. Plaintiff offers absolutely no evidence that Killarney's investigation was the product of gender bias, with the exception of the preposterous assertion that after the second monitor shattered, the individual who was then present was not investigated or interrogated. Plaintiff's Rule 56.1 Statement at ¶ 207. To state the obvious, this second person was not investigated because the subsequent incident clearly demonstrated that the problem was a manufacturing defect, and there was no need to investigate the possibility of criminal mischief by an employee. Moreover, the second individual was not investigated was also a woman, a fact that belies plaintiff's claims that she was singled out because of her gender. *See* Berg Affidavit Ex. 73.

Because no reasonable jury could conclude that Killarney's investigation of plaintiff was the product of gender discrimination, we dismiss the claim against him.

### C. O'Connor

■ Plaintiff cites three separate incidents in an attempt to make out an equal protection claim against O'Connor. First, plaintiff claims that in 1992, some five years prior to the filing of the complaint, O'Connor told her, "You know, as soon as they find out you're pregnant, they're going to let you go." Plaintiff's Rule 56.1 Statement ¶ 71. The statute of limitations for actions under § 1983 is the statute of limitations applicable to personal injuries occurring in the state in which the appropriate federal court sits. *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). In New York State, the applicable statute of limitations for personal injuries is three years. *Gleason v. McBride*, 869 F.2d 688, 691 (2d Cir. 1989).

■ While this allegation against O'Connor predates the limitations period, plaintiff asserts that she was subjected to a "continuing violation" of such a character as to extend the limitations cut-off. The continuing-violation exception "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations." *Annis*, 136 F.3d at 246 (internal quotation omitted). The Second Circuit has held that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993) (internal citations omitted). However, a continuing violation may be found "where there is proof of specific ongoing discriminatory polices or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994). "The courts in this circuit consistently have looked unfavorably on continuing violation arguments. Indeed, only compelling circumstances will warrant application of the exception to the statute of limitations." *Riedinger v. D'Amicantino*, 974 F.Supp. 322, 325 (S.D.N.Y.1997) (internal quotations omitted).

■ Plaintiff's own admissions are fatal to the viability of her continuing violation argument. While plaintiff claims that this incident occurred in 1992, her Rule 56.1 Statement makes clear that she did not complain of this incident to anyone until February of 1995, some three years after the incident occurred. Plaintiff's Rule 56.1 Statement at ¶¶ 246, 250. Plaintiff cannot show that this comment was part of "specific ongoing discriminatory polices or practices, or [that] specific and related instances of discrimination [were] permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice," *Cornwell*, 23 F.3d at 704, when plaintiff did not voice her objection related to this comment to any superior officer until three years after the incident occurred. Therefore, O'Connor's disparaging comments regarding pregnancy in 1992 cannot form the basis of her equal protection claim.

■ Alternatively, plaintiff directs the Court to an incident that occurred in early 1995 between O'Connor and herself. After being confronted by her superiors and accused of breaking the computer monitor, plaintiff became extremely upset. She decided to leave work immediately and, as is required, completed a "Leave Slip" before departing. On this form, plaintiff wrote "mental duress" as the reason why she was leaving work. When she returned to the job, O'Connor asked her to re-draft the slip so as to omit the phrase "mental duress" from the form. Plaintiff's Rule 56.1 Statement at ¶¶ 198–99. Without further explanation, plaintiff seems to contend that

this conduct establishes an equal protection claim. We hold no reasonable jury could find that this conduct constituted a violation of plaintiff's equal protection rights. It is clear that plaintiff was attempting to create a favorable record of documentation for future litigation, and, as plaintiff herself emphatically argues, O'Connor was attempting to impede her ability to do so. Plaintiff's Rule 56.1 Statement at ¶ 225. While O'Connor's action may have been inappropriate, plaintiff has offered no evidence that it was motivated in any way because of plaintiff's gender.

■ Finally, plaintiff complains that O'Connor threatened to bring her up on disciplinary charges for hanging her uniform on a hanger, instead of in her personal locker. Because other men were allowed to use hangers without threat of discipline, plaintiff claims that O'Connor violated her equal protection rights. However, based upon the applicable law in this circuit, no reasonable jury could find that O'Connor's threat rose to the level of a constitutional tort. Even if plaintiff's allegations are true, and even if plaintiff's male co-workers were allowed to use hangers without threat of discipline, plaintiff simply cannot prove that this threat of discipline, which was not carried out, was " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive environment.' " *Harris,* 510 U.S. at 21, 114 S.Ct. 367 (quoting *Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. 2399); *Tomka,* 66 F.3d at 1305. Harassment must "transcend[ ] coarse, hostile and boorish behavior [to] rise to the level of a constitutional tort," *Annis,* 36 F.3d at 254. Simply put, being told that you may not use a clothes hanger instead of the locker provided does not rise to the level of a constitutional violation. Plain-

tiffs gender discrimination claim against O'Connor is accordingly dismissed.

### D. *Brophy*

■ The basis of the gender discrimination claim against Brophy is somewhat unclear. It appears plaintiff complains of the fact that Brophy, as Undersheriff, ordered her to remain confined in her home from 9:00am to 5:00pm while out on disability in 1994, and required her to come into work each Monday for a report on her medical status. However, in regard to the home confinement policy, plaintiff has presented no evidence that she was treated differently than similarly situated males in this regard, and it appears the practice was fairly common at the Department. *See* Thoubboron's Deposition Testimony at 64. Plaintiff seems to believe that these requirements were imposed in her case because she is a woman, but offers absolutely no evidence to support this conclusion. The Department's confinement policy therefore cannot form the basis of plaintiff's equal protection claim against Brophy.[3]

In regard to the Monday morning assessments, plaintiff has at least directed the court to some evidence that this was an uncommon practice. More specifically, Brophy testified that plaintiff was, to his knowledge, the only employee for which such assessments were required, and Victor Nester, a co-worker of plaintiff's, testified that he, while out on disability, was not required to come in for weekly assessments. *See* Brophy Deposition Testimony at 21; Nester Deposition Testimony at 16.

Despite this evidence, Brophy has furnished such persuasive evidence of a nondiscriminatory reason for these Monday morning assessments that we hold that no reasonable jury could find for plaintiff on

---

**3.** We have included the home confinement policy is our analysis of plaintiff's equal protection claim only in an effort to give plaintiff every opportunity to state a cause of action. In fact, plaintiff has not even cited the home confinement in her discussion of the equal

protection claim, *see* Plaintiff's Memorandum of Law at 20–1, and she appears to rely on this incident primarily to state a First or Fourth Amendment claim as opposed to an equal protection claim.

this claim. Prior to the Monday morning meetings, plaintiff was out on disability for a shoulder injury. On February 2, 1993, a County physician wrote a letter to the defendants, explaining, "This patient has a moderate disability. I think she could go back to light duty if she did not use her right arm and just used her left arm for such sedentary functions as answering the phone or filing papers." *See* Berg. Affidavit. Ex. 37. In receipt of this letter, the defendants, on February 10, 1993, ordered plaintiff to return to work. *See* Plaintiff's Rule 56.1 Statement at ¶ 80. Defendant Thoubboron's letter ordering her to return clearly took account of plaintiff's physical limitations:

> As of 11:30pm, February 11, 1993, you are to report for limited, light duty in the correctional facility. All supervisors in the correctional facility are aware of the limitations placed on you as a result of your medical condition. If a situation arises during your working hours which requires an activity from which you are restricted, immediately contact your shift supervisor to remedy same.

*See* Berg Affidavit Ex. 38. Nonetheless, plaintiff telephoned the Department and notified them that she would not return to duty until her own physician cleared her to return. *See* Berg Affidavit Ex. 36. Some two weeks later, plaintiff's own physician made exactly the determination made by the County's physician, concluding that she could return to work for light duty. *See* Berg Affidavit Ex. 40. Surprisingly, plaintiff continues to argue that she was ordered on February 10 to return to work, "despite her doctor indicating she was not capable of doing so," *see* Plaintiff's Rule 56.1 Statement at ¶ 88, but provides no evidence that her doctor indicated that she could not return to work.

Plaintiff further impeded the defendants' efforts to ascertain when she might return to work by initially refusing to sign a medical authorization allowing the Department access to her medical records. Plaintiff's Rule 56.1 Statement at ¶ 39.

Plaintiff contended that defendants should be allowed access to medical records only relevant to this specific injury, and relented only after being informed by her union representative that such blanket authorizations were required as a matter of course for all employees out on disability leave. *See* Plaintiff's Deposition Testimony at 88.

■ Following these events, and after plaintiff had briefly come back to work only to return to disability leave shortly thereafter, Brophy asked plaintiff to come in for weekly status reports on her medical condition. We hold that given plaintiff's prior behavior, Brophy has adduced such a convincing non-discriminatory reason for these meetings that no reasonable jury could conclude that the meetings were a product of gender discrimination. In fact, in retrospect, Brophy was quite insightful as to the need to monitor plaintiff's health, as she would require a shocking number of extended leaves of absence throughout her entire tenure with the Department: while employed from 1990–1997, plaintiff was absent from the Department from September 1, 1992–November 13, 1992, from January 1, 1993–February 24, 1993, from May 8, 1993–July 25, 1994, for a brief period in 1995, and in July of 1996. These Monday morning meetings were clearly aimed at learning when plaintiff might be able to return to work, and no reasonable jury could find that they were imposed as a result of gender discrimination.

■ Finally, even if plaintiff had adduced some evidence that Brophy imposed this requirement on her because of her gender, being required to report for Monday morning meetings, while receiving full pay from the Department, is a condition so trivial that it does not rise to the level of a constitutional tort. *See Shabat v. Blue Cross Blue Shield,* 925 F.Supp. 977, 987 (W.D.N.Y.1996) ("The actions that plaintiff alleges were taken against him in the case at bar … are so trivial that they cannot reasonably be considered adverse…."). For these reasons, the equal protection claim against Brophy is dismissed.

## E. *Le Fever*

■ It appears that plaintiff's allegations of gender discrimination against Le Fever revolves around a single issue. Plaintiff alleges that in a meeting on July 18, 1995, Le Fever and Butler punitively assigned her to work the midnight shift in the new female unit at the correctional facility. Plaintiff's Rule 56.1 Statement at ¶ 269. Because no reasonable jury could find that this assignment was the product of gender discrimination, the equal protection claim against Le Fever must be dismissed.

Plaintiff's own testimony compels this result, as she admits that the midnight assignments pertained only to the new women's correctional wing, where only female correctional officers were permitted to work:

Q: Were other female officers also assigned to the female housing unit?

A: Yes, they were.

Q: Did men work in the female housing unit?

A: No, they did not.

Plaintiff's Deposition Testimony at 181. Since plaintiff has made no allegation that the entire system of assigning women to the woman's correctional facility was discriminatory, we are mystified as to how this assignment could be a violation of her equal protection rights. To state the obvious, if only women could work in the all-female prison, some women would have to work the midnight shift. This admission makes it impossible for plaintiff to argue that she was treated differently from similarly situated males. While plaintiff may have been assigned to this post because Le Fever did not like her, was tired of complaints, or was simply being unkind, this does not state a violation of her equal protection rights based upon her gender.[4]

## F. *Butler*

The crux of plaintiff's equal protection claim against Butler also rests upon the midnight-shift assignment, since she alleges that both Le Fever and Butler were responsible for assigning her to these shifts. Plaintiff's Rule 56.1 Statement at ¶ 269. For precisely the same reasons as enunciated above in regard to Le Fever, Butler's motion for summary judgment must be granted.[5]

## G. *Turner*

■ While Turner also asks this Court to dismiss the equal protection claim

---

4. We also note that plaintiff seems to predicate her equal protection claim against Le Fever based upon derogatory remarks he made about pregnancy in 1991, some three years prior to the statute of limitation period and six years prior to the filing of the complaint. For the same reasons stated in our treatment of O'Connor's comments about pregnancy, Le Fever's comments cannot support her claim. In order to qualify under the continuing violation exception to the statute of limitation requirement, plaintiff must show that "there is proof of specific ongoing discriminatory polices or practices, or [that] specific and related instances of discrimination [were] permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell,* 23 F.3d at 704. Yet, by plaintiff's own admission, she did not report Le Fever's conduct because she did not "want to make waves." Plaintiff's Deposition Testimony at 45. While this court is sympathetic to plaintiff's hesitancy to report inappropriate conduct by a superior officer, her total silence on this matter makes it impossible for us to rule that his comment was part of departmental "polices or practices...." *Cornwell,* 23 F.3d at 704. Finally, we hardly need respond to plaintiff's claim that Le Fever violated her equal protection rights by failing to inquire about the welfare of her fetus after she fell. *See* Plaintiff's Amended Complaint at 26. Simply put, bad manners do not constitute a civil rights violation.

5. Plaintiff also seems to rely on the Monday morning medical assessments in her claim against Butler, since he, like Brophy, was present for many of the meetings. Plaintiff's Deposition Testimony at 24. For the reasons stated above in regard to Brophy, these Monday meetings cannot form the basis of an equal protection claim. Further, while plaintiff seems to rely also on the investigation related to the touch-screen monitor in making her equal protection claim against Butler, for the reasons already explained in reference to Killarney, this claim must fail as well.

against him, plaintiff's allegations are sufficient to withstand his motion. First, plaintiff alleges and Turner does deny that, although she was eligible to be promoted in 1995, Turner did not recommend her for promotion, and recommended male employees instead. *See* Thoubboron's Deposition Testimony at 56, 84. Plaintiff further contends that those promoted had less seniority than she. *See* Plaintiff's Amended Complaint at ¶ 53. Turner explains this decision with the entirely plausible explanation that he did not recommend plaintiff for promotion because she was suicidal, and directs the Court to substantial evidence to support that plaintiff was, in fact, severely depressed. *See* Defendants' Ex. O. Even if a jury may ultimately be convinced by Turner's explanation, however, a disputed issue of material fact still exists. Turner claims plaintiff was not promoted because she was suicidal. Plaintiff says she was not promoted because she is a woman. In support of this assertion, plaintiff alleges that men with less seniority were promoted ahead of her. *See* Plaintiff's Amended Complaint at ¶ 53. Further, she suggests that Turner's explanation was simply a pretext for discrimination since, if Turner truly believed she was suicidal, he would not have continued to allow her to guard prisoners or carry a firearm. *See* Turner's Deposition Testimony at 38–9; Thoubboron's Deposition Testimony at 84–5. This is the kind of proof required under *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, and a jury must decide whose version of events they believe. It is sufficient for our purposes that material facts are in dispute.

Similarly, plaintiff claims that Turner violated her equal protection rights based upon his investigation of her alleged falsification of public records. These allegations are also sufficient to defeat Turner's motion for summary judgment. It appears that, for approximately two hours on June 13, 1996, plaintiff indicated in her logs that she was making her required rounds of the prison when, in fact, another officer was performing her rounds for her. Turner, the chief criminal investigator for the Department, pursued criminal charges against plaintiff. *See* Thoubboron's Deposition Testimony at 29. Because the response of the Department, including Turner, to this violation, was allegedly so disproportionate to the treatment of male employees for similar infractions, Turner's motion for summary judgment must be denied.

For example, the parties do not dispute that Joseph Cuccinello, who agreed to abandon his own watch on June 13 in order to perform plaintiff's watch, was not brought up on criminal charges, or even disciplined, based upon his conduct.[6] *See* Thoubboron's Deposition Testimony at 110. Moreover, there was substantial testimony that sleeping while on duty, especially during the midnight shift, was a frequent occurrence, *see* Plaintiff's Rule 56.1 Statement at ¶¶ 349–52, yet the Department had never pursued criminal charges against any other employee for such an infraction. *Id.* According to testimony, one such employee, Antal Varga, slept so much while on duty that he was referred to as "the sleeper" by fellow employees. *See* Plaintiff's Rule 56.1 Statement at ¶ 344. Varga, however, was simply "warned" that such conduct was inappropriate, whereas plaintiff was charged with a felony. *Id.*[7] We recognize that Turner, and the other defendants,

---

**6.** In this way, this case resembles *Sorlucco v. New York City Police Dep't,* 888 F.2d 4 (2d Cir.1989), in which the plaintiff defeated defendant's motion for summary judgment by showing that after she reported an alleged rape by a co-worker, she was brought up on disciplinary charges for making a false report, while the conduct of the male co-worker was not even investigated by the employer.

**7.** We also note that, after hearing the evidence related to this charge, the grand jury refused to indict plaintiff and the criminal charges against her were dismissed. *See* Berg Affidavit Ex. 91.

have made a variety of somewhat technical arguments to justify their treatment of plaintiff. For example, they have argued that plaintiff's conduct was especially reprehensible because it occurred while a suicide watch was in effect, thus inducing Cuccinello to abandon that watch so he could perform plaintiff's duties. Turner is free to offer this and any other explanation to the jury, which must determine whether the bringing of criminal charges against plaintiff for this incident was grossly disproportionate to the treatment of similarly situated males who committed like infractions. For this reason, Turner's motion for summary judgment is denied.

## H. *Thoubboron*

For the same reasons as enunciated above in regard to Turner's motion for summary judgment, Thoubboron's motion must also be denied. In regard to plaintiff's allegations related to her promotion in 1995, Thoubboron testified that while Turner made promotion recommendations to him, Thoubboron himself had final decision-making authority about whom to promote. *See* Thoubboron's Deposition Testimony at 56. Thus, as explained above in rejecting Turner's motion, a disputed issue of material fact remains as to the true basis for these promotion decisions.[8]

Similarly, those allegations sustaining plaintiff's equal protection claim against Turner in regard to the felony tampering charges are equally applicable to Thoubboron. While Turner was the chief investigator assigned to the case, Thoubboron testified that he approved of plaintiff's arrest, and made the determination to pursue disciplinary charges against her, even though the criminal charges against her

were dismissed. *See* Thoubboron's Deposition Testimony at 17, 29–30, 101–4. Thus, as explained above, because the defendants' response to plaintiff's alleged wrongdoing was allegedly so disproportionate as compared to the treatment of other similarly situated males, Thoubboron's motion for summary judgment must be denied.

## I. *County of Putnam*

It is well-established that in order to sustain a claim against a municipal defendant for relief under § 1983 against a municipal defendant, the plaintiff must show the existence of an officially adopted policy or custom that caused injury and a causal connection between that policy or custom and the deprivation of the constitutional right. *Monell v. Department of Social Servs. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Pursuant to *Monell*, the County has moved for summary judgment, claiming that plaintiff has failed to show that the discrimination alleged was the product of a municipal policy or custom. Although poor briefing from the parties has left the issue unclear, the County's motion is denied.

A single act of a municipal officer is sufficient to establish municipal liability if that individual officer is possessed of "final policy-making authority with respect to the area in which the action is taken." *McMilian v. Monroe Cty.*, 520 U.S. 781, 785, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). Plaintiff has alleged that Thoubboron had final policymaking authority over the decision whether to promote her and over whether to bring disciplinary

---

**8.** We will defer ruling on the 1992 promotion decision until trial, but, on the basis of the information now available to this Court, it appears that the 1992 decision will be inadmissible at trial. Plaintiff herself explains that until April of 1993, all promotion decisions were based on a straight seniority system, *see* Plaintiff's Rule 56.1 Statement at ¶ 6, yet she complains that a promotion decision which she herself appears to date around February of 1992, *id.* at ¶ 27; Plaintiff's Deposition Testimony at 70, was the product of gender discrimination. We do not understand how plaintiff can assert that this decision was the product of discrimination, while simultaneously asserting that the Department was required at this time to promote based upon seniority alone.

charges against her. Because sufficient evidence exists in the record to support such a claim, the County's motion for summary judgment must be denied.

For example, in deposition testimony about decisions to fire and promote employees, Thoubboron responded to questions about his decisions to terminate and promote employees, *see* Thoubboron's Deposition Testimony at 54–6, without giving any indication that these decisions were not his, and his alone, to make. In fact, it is clear from his testimony that Thoubboron believed that others were to make promotion recommendations to him, but that he had final decision-making authority about those promotions. *Id.* at 55. For example, in testifying about his promotion decisions, Thoubboron explained, "If her [plaintiff's] name were presented to me, I would have considered it." *Id.* Thoubboron never qualifies these responses with any indication that his decisions were subject to review. Similarly, in response to questions about the decision to bring plaintiff up on disciplinary charges, Thoubboron indicates that he possessed responsibility for making final decisions on that issue. *Id.* at 101 (Q: "Had you ever done that before, that is make a final determination on a disciplinary [charge]?" A: "Yes.").

We concede that it is entirely possible that Thoubboron did not, in fact, have final policymaking authority in regard to either the promotion or disciplinary decisions. As the Supreme Court has explained:

> .... the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions

would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 484 fn. 12, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

It is plausible that the Sheriff did not have such final policymaking authority, and thus the County cannot be liable for his actions. However, Thoubboron's deposition testimony, at the very least, creates a genuine issue of material fact related to this issue. Moreover, the County has essentially provided no evidence in any of its voluminous motion papers to challenge the assertion that Thoubboron was a final policymaker. Instead, the County simply asserts that the "Sheriff is a duly elected State Constitutional Officer," *see* Defendants' Memorandum of Law at 19, and claims that the New York Constitution prevents the County from being made liable for the acts of a sheriff. *Id.* These assertions, however, have little or nothing to do with the fundamental issue regarding the County's liability, which is whether the County "delegated its power to establish final employment policy to the Sheriff." *Pembaur,* 475 U.S. at 484 fn. 12, 106 S.Ct. 1292. Since the County has offered no evidence on this issue, and since the ultimate burden of showing the absence of a genuine issue of material fact resides with the movant, *Adickes,* 398 U.S. at 157, 90 S.Ct. 1598, the County's motion must be denied.

## A. *Qualified Immunity*

 The doctrine of qualified immunity protects government officials from liability for civil damages if the challenged

action "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The only remaining claims, an equal protection claim against Turner, Thoubboron, and the County, allege violations of constitutional rights of which any reasonable person would be aware. Plaintiff alleges that Turner did not recommend her for promotion because she is a woman; further, she claims that Turner pursued felony criminal charges against her because of her gender. No reasonable person would believe that such conduct was permissible.

Similarly, plaintiff alleges that Thoubboron did not promote her because she is a woman, and also approved of her arrest and subsequent discipline because of her gender. It is well-settled that the Fourteenth Amendment's protection extends to the right not to be discriminated against because of one's gender. *See Poulsen v. City of North Tonawanda,* 811 F.Supp. 884 (W.D.N.Y.1993). Similarly, if the County knowingly permitted Thoubboron to make final policy in regard to these decisions, clearly established Supreme Court precedent should have apprised the County that it could incur liability for such conduct. *Pembaur,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452.

III. *Section 1983 First Amendment Claim*

■ In order to prevail on this § 1983 freedom of speech claim, plaintiff must demonstrate by a preponderance of the evidence that: 1) the speech at issue is protected; 2) that he suffered an adverse employment action; and 3) there was a causal connection between the protected speech and the adverse employment action. *Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994). Because plaintiff's allegations fail to satisfy this first requirement, her First Amendment claim against each of the defendants must be dismissed.

■ For speech to be protected under the First Amendment, it must relate to "any matter of political, social or other concern to the community," *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). This means that:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. 1684. While plaintiff claims that she was retaliated against because she engaged in protected speech, because all of her complaints related entirely to personal matters, her First Amendment claim must be dismissed. More specifically, plaintiff claims that the defendants retaliated against her for engaging in the following speech: (1) in 1992, she complained that she was wrongly docked sick days when she should have been permitted to remain on disability leave, and filed a grievance to have her lost sick days credited back to her; (2) in 1994, she protested the fact that she had to report for weekly meetings while out on disability, and also protested the fact that she was ordered to return to work on light duty; (3) she filed a grievance regarding the denial of a vacation request in August of 1994; and (4) in 1995, plaintiff filed a grievance alleging that she should be credited with lost pay because of the County's delay in scheduling a doctor appointment to clear her to return to work from disability leave.

These complaints were clearly directed "solely in order to further [her] own employment interest," *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir.1993), and the Second Circuit has specifically held that speech directed to further personal interests does not warrant constitutional protection. *Id.; see also*

*Connick,* 461 U.S. at 148–49, 103 S.Ct. 1684 ("To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case").

■ The only speech offered by plaintiff that even arguably involves a matter of public concern consists of a February 13, 1995 anonymous letter authored by plaintiff.[9] In that letter, plaintiff complains that defendant O'Connor "physically forces himself on female officers and if they reject his sexual advances they are more or less punished via changing their shifts or demeaning them in front of other officers." *See* Berg Affidavit Ex. 76. A claim of sexual abuse of subordinates by a supervising officer could constitute speech on a matter of public concern.

■ However, we note the question of whether an "employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. A reading of this letter as a whole shows that plaintiff was really concerned about entirely personal grievances. The majority of the letter complains of O'Connor's failure to answer the radio, his insistence that officers hang their clothes inside a locker, and his penchant for scolding officers in a "spiteful and demeaning" manner, *see* Berg Affidavit Ex. 76, the same conduct which plaintiff alleges was directed against her. Taken in context, it is clear that plaintiff was simply upset with the way one of her superior officers treated her, and her complaints had absolutely no relation to any matter of political, social, or other concern in the community. *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. Plaintiff was speaking "not as

a citizen upon matters of public concern, but instead as an employee." *Id.* at 147, 103 S.Ct. 1684.

■ Lastly, in a creative but unsupported argument, plaintiff tries to evade the public concern requirement by arguing that we should treat her allegations differently because of the manner in which she complained. More specifically, plaintiff argues that because she filed grievances and utilized the union to protest these work conditions, her freedom to petition government under the First Amendment has been violated, and thus, the public concern analysis is irrelevant. *See* Plaintiff's Memorandum of Law at 5–7. We are mystified by plaintiff's argument, since the Second Circuit has specifically held that the right to petition the government for the redress of grievances is generally subjected to the same constitutional analysis as the right to free speech. *White Plains Towing Corp.,* 991 F.2d at 1059. The public concern requirement is clearly established, and there is no reason that we should abandon that requirement simply because plaintiff communicated through a more formalized grievance process. It would be incongruous to hold that a complaint about vacation time, for example, does not implicate the First Amendment, but if that same complaint was made via a formal grievance process, then plaintiff's constitutional freedom has suddenly been implicated. It is a distinction that would effectively eviscerate the public concern requirement in First Amendment cases, and we reject it accordingly. We therefore dismiss plaintiff's First Amendment retaliation claim against each of the defendants.

### IV. *Plaintiff's Fourth Amendment Claim*

Plaintiff states two separate grounds for allegation that each of the defendants violated her Fourth Amendment right to be

---

**9.** We note the irony of plaintiff claiming she was retaliated against because of speech contained in a letter that she failed to sign. Since, however, in a meeting on February 15, 1995, one of the defendants apparently deduced that plaintiff was the author of the letter, we will consider the substance of that letter. See Plaintiff's Rule 56.1 Statement at ¶ 246.

free from unreasonable seizure. Both of these grounds are equally implausible, and we therefore dismiss plaintiff's Fourth Amendment claim in its entirety.

 First, plaintiff alleges that her arrest for tampering with public records violated her Fourth Amendment rights. The Fourth Amendment provides that "[t]he right of the people to be secure ... against unreasonable .... seizures, shall not be violated." As is well established, however, the existence of probable cause defeats any Fourth Amendment claim. *See, e.g., Oliveira v. Mayer,* 23 F.3d 642, 648–49 (2d Cir.1994). Here, in plaintiff's own Rule 56.1 Statement, she specifically concedes that multiple non-parties to this lawsuit had advised the defendants, prior to plaintiff's arrest, that she was asleep on duty during the period in which she had indicated in her log that she had made her required rounds. Plaintiff's Rule 56.1 Statement at ¶¶ 321, 329. The testimony of multiple witnesses to this incident at plaintiff's disciplinary hearing also makes clear that they observed her sleeping on the night in question and reported that information to investigators prior to her arrest. *See, e.g.,* Disciplinary Hearing Transcript at 30–50, 104–5. This information is wholly sufficient to establish probable cause for plaintiff's arrest, and no reasonable jury could conclude otherwise. Because the defendants were specifically told by numerous non-party witnesses that plaintiff was asleep during a given period of time, and had her log, in which plaintiff indicated that she had made required rounds during that period, probable cause for her arrest was clearly established.[10]

██ Second, plaintiff alleges that her home confinement while out on disability leave violated her Fourth Amendment rights. As a threshold matter, plaintiff is correct that "...the Fourth Amendment protects individuals from unreasonable searches [and seizures] conducted by the Government, even ·when the Government acts as an employer...." *Nat. Treasury Employees Union v. Van Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (internal citations omitted). However, plaintiff has attempted to extend this principle to the Department's requirement . that while employees are out of work on paid disability leave, they remain at home during normal working hours. We assume, without deciding, that the Fourth Amendment was not intended to extend so far. As the Second Circuit has held:

> ....a seizure occurs only when a reasonable person would feel restrained by physical force or a show of authority. Factors suggesting that a seizure has occurred include: the threatening presence of police officers; the display of a weapon; physical contact by the officer; language indicating that compliance with the officer is compulsory; prolonged retention of a person's belongings; and a request by an officer to accompany him or her to the police station or a police room. ·

*Gardiner v. Inc. Village of Endicott,* 50 F.3d 151, 155 (2d Cir.1995) (internal citations omitted). Because home confinement while out on paid disability leave is so far removed from "feel[ing] restrained by physical force or a show of authority," *id.,* we doubt the Fourth Amendment applies.

---

**10.** We note that in the Fourth Amendment context, unlike the equal protection context, the defendants' motives are essentially irrelevant. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Thus, even if defendants arrested plaintiff because she is a woman, or because she complained about her working conditions, this would be insufficient for a Fourth Amendment cause of action. The existence of probable cause insu-lates these defendants from suit for a Fourth Amendment violation, even if their motives for arresting her were illicit. Of course, if, for example, plaintiff was arrested only because she is a woman, then this would be sufficient to state an equal protection claim. It is for this reason that this arrest may support an equal protection claim, even though it fails to state a Fourth Amendment claim.

Even if we were wrong in this conclusion, however, the defendants would be entitled to qualified immunity on this issue. No case relied on by plaintiff in relation to the home confinement policy makes any mention of the Fourth Amendment. *Hambsch v. Dep't of Treasury,* 796 F.2d 430 (Fed.Cir.1986); *Uryevick v. Rozzi,* 751 F.Supp. 1064 (E.D.N.Y.1990); *Voorhees v. Shull,* 686 F.Supp. 389 (E.D.N.Y. 1987). Instead, each of these decisions has to do with such rights as freedom of religion, freedom to travel, and voting rights, all claims that are clearly absent from the plaintiff's amended complaint. Thus, since plaintiff directs the Court to no cases in which a home confinement policy was said to implicate the Fourth Amendment, we are compelled to rule that even if this policy was violated, the defendants were objectively reasonable in their belief that such a plan did not violate the Fourth Amendment. Plaintiff's Fourth Amendment claim is dismissed accordingly.

## CONCLUSION

For the reasons stated above, the motion is granted as to the § 1983 equal protection claim in regard to defendants Killarney, O'Connor, Brophy, Le Fever, and Butler, but denied in regard to defendants Turner, Thoubboron, and the County. Moreover, the § 1983 claims under the First and Fourth Amendment are dismissed in their entirety.

SO ORDERED.